**Grant FOSTER and Barbara Dunn Foster, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 11250–11252.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 7, 1967.

Decided Feb. 1, 1968.

Deane E. McCormick, Jr., and George Cochran Doub, Washington, D. C., (Robert J. Bird, Washington, D. C., Weinberg & Green, Baltimore, Md., and Alvord & Alvord, Washington, D. C., on brief) for petitioners.

Bennet N. Hollander, Atty., Dept. of Justice (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and Joseph M. Howard, Attys., Dept. of Justice, on brief) for respondent.

Before SOBELOFF and BRYAN, Circuit Judges, and MARVIN JONES, Senior Judge, U. S. Court of Claims.*

MARVIN JONES, Senior Judge:

Grant Foster was born in 1915 in Fairview, Arizona. In 1939 he went to Venezuela to work for Martin Engineer-

* Sitting by designation of the Chief Justice.

ing Company, which was engaged in heavy construction work. He advanced from heavy equipment operator to foreman and job superintendent while working for Martin. In July 1946 he left that company to become the sole proprietor of his own construction business in Venezuela.

Early in 1949 an official of the Venezuelan Ministry of Public Works approached Foster with a plan under which he and two other public works officials would use their positions to give Foster's company advance information on construction contracts, special consideration in the award of these contracts, leniency in inspections of work, and prompt issuance of progress payments. Foster would be entitled to withdraw from the business a salary of $100,000 per year; each of the three officials would receive secret payments of $100,000 a year if the earnings of the company were sufficient. Foster and the Venezuelan officials agreed orally to this arrangement.

This clandestine agreement remained in effect from 1949 through 1956, during which time Foster Construction, C. A., prospered tremendously. Foster made a final settlement with the officials in 1964, when he met two of them in Switzerland and paid them $600,000 from a Swiss bank account which he had kept for that purpose.

In connection with the secret agreement, Foster had his business incorporated under the laws of Venezuela in February 1949. During the taxable years in question, Grant Foster was the president and principal stockholder[1] of the corporation, which operated under the name Foster Construction, C. A. The articles of incorporation gave the president "full powers of decision and administration to carry out all kinds of opera-

tions," and, in practice, Foster was in complete charge of the corporation's affairs.

Grant Foster maintained a personal bank account at the Bank of London & South America, Ltd., New York Agency, from May 1, 1947 to August 2, 1949. On the latter date this account was closed and the balance of $12,102.32 transferred to a new account entitled Foster Construction, C. A. At the same time, $80,000 from the corporation's Venezuelan bank account was placed in this New York account. Both Grant Foster, as president, and his wife Barbara Dunn Foster, as vice president, were authorized to draw on the New York corporate account, but in practice only Grant Foster made withdrawals. From 1949 through 1956 large sums were transferred from the corporation's Caracas bank account to the New York account. During the same period, Grant Foster drew 1,109 checks totaling $5,281,480.91 on the New York account. The Commissioner's deficiency determinations were based on his conclusion that some of these checks had been used for Foster's personal purposes rather than for corporate purposes.

The personal or corporate nature of some of these withdrawals has been established by the respective concessions of the parties. Two hundred and fifty-four checks totaling $468,590.38 were expended in connection with the cost and operating expenses of corporate aircraft. Foster has conceded that $100,000.00 of these expenses were attributable to his personal use of the aircraft and were income to him.[2] Foster has also conceded that 156 other checks totaling $585,806.30, and ranging in amount from $3.30 to $200,000.00 were used for personal purposes such as personal loans and gifts to his relatives; deposits in personal bank ac-

---

1. Foster's representations of the stock ownership of Foster Construction, C. A. varied from time to time. However, the Tax Court was convinced throughout that at all times in question Foster remained the dominant stockholder of the company, and this conclusion is not challenged by Foster on appeal.

2. Foster argues, however, that the stipulation does not require the $100,000.00 to be taxed to him, since his personal use of the aircraft was a nontaxable fringe benefit. We consider this argument infra.

counts; an allowance to Barbara Dunn Foster for personal or household purposes; purchases at department stores; purchases and rental of automobiles; medical expenses; personal travel, hotel and entertainment expenses; clothing; charitable contributions; cost of building a home in El Cajon, California; schooling for Foster's children; payment of personal income taxes; gifts to female friends; rent payments; cash for Foster; country club initiation fees and dues; personal investments; and creation of a $200,000.00 personal trust. The checks remaining in dispute after the concessions by both parties amounted to $1,711,764.53.[3] The Tax Court considered each of the disputed checks separately and found that a substantial portion of them represented withdrawals or diversions of corporate funds for Foster's personal benefit. On this appeal, Foster leaves unchallenged the Tax Court's determinations with respect to these disputed checks except for those expended in connection with the Retsof Corporation. The latter issue is discussed *infra*.

In 1950 Foster retained T. A. Whiteside, a Miami, Florida, attorney, to handle his tax returns in the United States. He gave Whiteside copies of Venezuelan tax returns he had previously filed and discussed with Whiteside his salary arrangements with Foster Construction, C. A. and the various bank accounts on which he was authorized to draw. Whiteside remained Foster's attorney until May 25, 1956. The United States tax returns of Grant Foster and Barbara Dunn Foster for the years 1947 through 1954 were prepared by a Miami accountant, Otto Weber, at the request of Whiteside on the basis of information furnished by Whiteside. Another accountant, Charles D. Erwin, prepared the returns of Foster

and his wife for 1955 and 1956 after the attorney-client relationship between Whiteside and Foster had terminated and the income tax investigation had begun. All the returns were joint returns of Grant and Barbara Dunn Foster. All except one were filed with the Internal Revenue Service; the 1951 return was prepared but was never filed. None of the returns made any mention of the substantial amounts Foster withdrew from the New York account and applied to his personal purposes. The only taxable income disclosed in the returns consisted of comparatively small amounts of capital gains, dividends, interest, and rents. The Foster's adjusted gross income as shown by the filed returns was as follows:

| | |
|------|------------|
| 1949 | $ 4,585.13 |
| 1950 | 1,000.00 |
| 1952 | 3,175.46 |
| 1953 | 3,331.91 |
| 1954 | 4,732.59 |
| 1955 | 14,240.14 |
| 1956 | 5,417.48 |

Under the Internal Revenue Codes of 1939 and 1954, a non-resident United States citizen was entitled to exclude from gross income amounts received as "earned income" from sources without the United States.[4] "Earned income" is defined as

* * * wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered * * *.[5]

3. The dispute over several of these remaining checks was resolved by a supplemental stipulation of facts filed after trial and by other concessions on brief before the Tax Court.

4. Int.Rev.Code of 1939, ch. 1, § 116(a), 53 Stat. 48; Int.Rev.Code of 1954, § 911 (a) (1).

5. Int.Rev.Code of 1939, ch. 1, § 25(a), 53 Stat. 18. Substantially similar language is found in Int.Rev.Code of 1954, § 911 (b).

In the instant case, the parties stipulated the amounts of excludable "earned income" which Foster earned as salary from Foster Construction, C. A. during the taxable years in question. These amounts were the same as those reported by Foster in his individual income tax returns filed with the Venezuelan Government as "Salary or Other Remunerations" received from the corporation.

The parties stipulated in effect that the sums Foster withdrew from the New York account for his personal uses during each year may be applied against the amount of his excludable salary "for such year and/or his unpaid salary for prior years." [6] Thus only the excess of the personal withdrawals above his excludable salary are to be taxed to Foster. The total withdrawals found personal by the Tax Court, Foster's stipulated excludable salary, and the taxable excess of withdrawals over salary are indicated in the following chart:

|      | A Withdrawals found personal by the Tax Court | B Foster's stipulated excludable salary | C Amount taxable to Foster (A minus B) |
| --- | --- | --- | --- |
| 1949 | $ 34,980.20 | $ 18,656.25 | $ 16,323.95 |
| 1950 | 80,950.30 | 124,951.15 | 0 |
| 1951 | 251,025.66 | 75,132.81 | 175,892.85 |
| 1952 | 416,979.36 | 108,330.46 | 308,648.90 |
| 1953 | 217,505.56 | 101,941.86 | 115,563.70 |
| 1954 | 92,116.04 | 104,162.71 | 0 |
| 1955 | 195,003.19 | 104,161.87 | 90,841.32 |
| 1956 | 94,790.75 | 99,995.64 | 0 |

It will be noticed that in three of the taxable years, 1950, 1954 and 1956, Foster's excludable salary exceeded the amount of his personal withdrawals. Thus no tax is owed for these three years. In the other five years, however, the excess of withdrawals over salary are substantial, ranging from $16,323.95 in 1949 to $308,648.90 in 1952. The Tax Court found that "the gap between the taxable amounts which the evidence shows were clearly * * * diverted and the insignificant amounts of gross income in the returns is too substantial to have been overlooked by Foster when he signed the returns." Furthermore, as we shall discuss presently, Foster had engaged in highly questionable activities and attempted on numerous occasions to deceive the Government. Accordingly, the Tax Court concluded that part of the deficiencies in tax for the years 1949, 1951, 1952, 1953, and 1955 was caused by "fraud with intent to evade tax," and that the returns of Foster and his wife for 1949, 1952, 1953 and 1955 were "false and fraudulent with intent to evade tax."

6. Stipulation 24(c) reads:
   "The respondent concedes that, to the extent of petitioner Grant Foster's excludable salary, if any, * * * the Court may find as a fact that the aggregate amount of [certain concededly personal checks] with respect to any year may be applied against Grant Foster's salary for such year and/or his unpaid salary for prior years; provided, however, that there must first be applied against such salary any other amounts shown to have been paid to him as such or distributed to him or withdrawn by him in any other manner so as to constitute taxable income to him. Any excess remaining for any particular year after the full amount of Grant Foster's salary for that year and arrearages for prior years has thus been reached shall be treated as corporate distributions to Grant Foster * * *."

*Fraud*

Foster first urges that the Tax Court's finding of fraud was erroneous. He contends that he relied completely on his attorney in the United States, T. A. Whiteside, to handle all his tax affairs in this country. Foster argues that the deficiencies determined against him resulted from Whiteside's erroneous tax characterizations of some of the withdrawals from the New York account rather than from fraud on the part of Foster, and invokes the principle of Davis v. Commissioner of Internal Revenue, 184 F.2d 86 (10th Cir. 1950), that "to hold a taxpayer guilty of fraud, who without actual knowledge that a return is false, and after a full disclosure to the expert preparing the same, would be untenable." 184 F.2d at 88. The Tax Court voiced approval of the *Davis* principle, but found it inapplicable to this case because it had

> searched the record in vain for evidence showing that Foster supplied Whiteside, who handled the preparation and filing of petitioners' returns for the taxable years 1949 through 1954, and the accountant, who handled their returns for the years 1955 and 1956, after Foster and Whiteside had severed relations, with all the information needed by them to file correct returns * * *. The evidence does not disclose that Foster ever gave Whiteside information concerning all the diversions he was making to his personal use from the New York account or that Whiteside made any examination of that account which would permit Whiteside to prepare correct returns of his income reflecting the taxable effect of these diversions.

Foster argues strenuously that the court erred in its conclusion that Foster failed to disclose some of his withdrawals to Whiteside. He has failed, nevertheless, to point to any positive evidence that he disclosed to Whiteside or the accountant all facts necessary for the filing of correct returns.

Foster argues, however, that because the Commissioner has the burden of proof on the fraud issue, Int.Rev.Code of 1954, § 7454(a), the absence of proof of disclosure must be resolved against him. We cannot agree. It seems extremely unlikely that any *positive* proof of a failure to disclose would be available in a situation such as this. A lack of evidence of disclosure is itself some proof of nondisclosure, and when this lack of evidence of disclosure is accompanied by circumstantial evidence tending to support a finding of nondisclosure, that finding should stand. Such supporting evidence is abundantly present in this case in Foster's attempts to mislead the Government and in his manifest willingness to engage in corruption when it suits his monetary advantage. Further, according to Foster's own figures, the diversions not proven to have been disclosed to Whiteside *exceeded* the amount of Foster's stipulated excludable salary in 1949 and 1951.[7] Surely, if Whiteside had been informed of these diversions he would have adjusted Foster's taxable income accordingly. Still further, the testimony of the accountant who prepared Foster's tax returns for 1955 and 1956 discloses that he was not informed of the diversions from the New York account during those years. Foster does not dispute this testimony on appeal. In view of the foregoing considerations and

7. The following figures were compiled from charts on pp. 22 and 26 of Foster's brief:

|  | A | B | C |
| --- | --- | --- | --- |
|  | Withdrawals found personal by the Tax Court | Foster's excludable salary | Amounts not proven to have been known to Whiteside |
| 1949 | $ 34,980.20 | $18,656.25 | $34,980.20 |
| 1951 | 251,025.66 | 75,132.81 | 85,780.77 |

facts, we believe that the Tax Court's conclusion that Foster did not make full disclosure to his tax advisors was justified, and thus we hold that Foster is not entitled to rely on the principle announced in Davis v. Commissioner of Internal Revenue as a defense to fraud.

■ Foster next points out that the cause, and not the mere fact, of the omissions of income from his tax returns is relevant in determining whether fraud exists. He has constructed an elaborate argument to show that he had good reasons to believe that many of the specific withdrawals omitted from his returns were either corporate expenditures, reimbursements to himself from the corporation, or part of his excludable compensation. We have considered this argument long and carefully. It fails, however, to convince us that the Tax Court's conclusion of fraud was clearly erroneous.

First, this argument rests in part on Foster's purported reliance on Whiteside's tax characterizations of his expenditures from the New York account and is thus seriously compromised by lack of evidence of complete disclosure to Whiteside. Secondly, even if this inherent difficulty in the argument were overcome, other facts in the record would

still lead us to believe that this argument is no more than an after-the-fact attempt to justify omissions which were, at least in part, prompted by conscious wrongdoing on the part of Foster.[8]

■■ We base our conclusion upon the record as a whole because only rarely can fraud be proved by direct evidence of the taxpayer's intention. In deciding the fraud issue, the court must consider all the evidence properly before it, including the conduct of the taxpayer, the conduct of his business, and the circumstances surrounding the preparation of the alleged fraudulent return.[9] The Supreme Court, in Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1943), has stated that "affirmative willful attempt may be inferred from * * any conduct, the likely effect of which would be to mislead or to conceal." 317 U.S. at 499, 63 S.Ct. at 368. Several factors present in the record before us have been considered by other courts as evidence of fraud: Consistent and substantial understatement of income;[10] a taxpayer's motive behind the illegal derivation of income;[11] willingness to make false statements under oath, where it appeared financially advantageous to do so;[12] concealment of ownership of property;[13] and refusal to cooperate in the income tax investigation.[14]

---

8. The Tax Court agreed with this conclusion. It stated: "Moreover, even if Whiteside had masterminded the fraudulent returns, we are satisfied that Foster was no mere innocent beneficiary thereof and that he knowingly attempted to accept the benefits of such returns."

9. 10 Mertens, Law of Federal Income Taxation §§ 55.10, .16 (1964).

10. Holland v. United States, 348 U.S. 121, 139, 75 S.Ct. 127, 99 L.Ed. 150 (1954); Kurnick v. Commissioner of Internal Revenue, 232 F.2d 678, 681 (6th Cir. 1956); Rogers v. Commissioner of Internal Revenue, 111 F.2d 987, 989 (6th Cir. 1940). We recognize that understatement of income alone is insufficient to support a finding of fraud. However, where other facts in the record indicate a fraudulent intent, we think that the size and frequency of omissions are to be considered in determining fraud. See Furnish v. Commissioner of Internal Revenue, 262

F.2d 727, 728–729 (9th Cir. 1958); Anderson v. Commissioner of Internal Revenue, 250 F.2d 242, 249–250 (5th Cir. 1957), cert. denied, 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958); Bryan v. Commissioner of Internal Revenue, 209 F.2d 822, 828 (5th Cir. 1954), cert. denied, 348 U.S. 912, 75 S.Ct. 289, 99 L.Ed. 715 (1955).

11. Cf. Commissioner of Internal Revenue v. Smith, 285 F.2d 91, 98 (5th Cir. 1960).

12. See J. E. Wheeler, 14 CCH Tax Ct. Mem. 989, 992 (1955).

13. Furnish v. Commissioner of Internal Revenue, 262 F.2d 727, 729 (9th Cir. 1958); Remmer v. United States, 205 F.2d 277, 288 (9th Cir. 1953), rev'd on other grounds, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954).

14. Millikin v. Commissioner of Internal Revenue, 298 F.2d 830, 836 (4th Cir.

In five of the eight consecutive taxable years involved in the instant case, Foster failed to report income in amounts ranging from $16,323.95 to $308,648.90. The only income he reported during those years consisted of small amounts of capital gains, dividends, interest, and rents. No mention was made in any of the returns of withdrawals from the New York account. In order to enrich himself, Foster willingly agreed to the corrupt arrangement with the three Venezuelan public works officials under which Foster Construction, C. A. received special treatment in return for secret payoffs. Foster swore falsely in his 1949 income tax return that he was a minority stockholder of Foster Construction, C. A.; in his 1950 return he swore falsely that he had sold 47 shares of stock in the corporation. We agree with the Tax Court that the purpose of these misrepresentations was to create the impression that Foster was a mere employee of a foreign corporation whose entire remuneration was excludable earned income. Similarly, the evidence discloses a letter dated March 30, 1958, from Foster to Pedro Estrada, the former Chief of Secret Police of Venezuela, in which Foster asked Estrada to give a false statement to the Internal Revenue Service that Estrada was a principal stockholder in Foster Construction, C. A. Foster testified before the Tax Court that he was a minority stockholder in the corporation. The court termed this testimony "misleading" and found it "beyond belief." Other instances of Foster's misrepresentations of his stock ownership appear in the record. In this appeal, Foster does not challenge the Tax Court's conclusion that he was the principal stockholder and in full charge of the corporation.[15] Lastly, in the words of the Tax Court, "during the course of the investigation of his returns he was wholly uncooperative and displayed an attitude of rigid and uncompromising determination to prevent the Government from learning about the details of his corporation's financial affairs that might throw light upon his own income."

Taken as a whole, the record shows that Foster drew indiscriminately on the New York account for purposes ranging from legitimate corporate expenditures to personal gifts for friends and relatives. It is evident that he never intended to pay taxes on any of this money, because not only did he fail to report any personal income from the account, he consistently attempted to mislead the Government about ownership of the corporation.

In view of all of the foregoing evidence, we are unable to conclude that the Tax Court's finding of fraud was clearly erroneous.

### Burden of Proof

As we have seen, the deficiencies involved in this case stemmed from Foster's failure to report as income sums of money he withdrew from the New York bank account of Foster Construction, C. A. A total of 1,109 checks were drawn on the account during the taxable years in issue. Many of the specific checks that the Commissioner had originally characterized as taxable to Foster were eventually conceded to have been used for corporate purposes. Others were found by the Tax Court to have been used for the benefit of the corporation.

1962); Granat v. Commissioner of Internal Revenue, 298 F.2d 397, 398 (2d Cir. 1962).

15. Foster has argued that the stock ownership of Foster Construction, C. A. is irrelevant to the issue of fraud, since it was undisputed Foster was the only one who drew checks on the New York account and was given full control of the corporation by its articles of incorporation. Its relevance appears fairly obvious and elementary to us. If the Government were made to believe that Foster was only a minor stockholder, it would naturally look with less suspicion on his withdrawals from the corporation's bank account. Until this appeal, moreover, Foster thought the issue relevant enough, as attested to by his repeated disavowals of majority stock ownership.

Foster now argues that because some of the withdrawals included in the Commissioner's original deficiency determination have proven incorrect, the presumption of correctness normally attributed to such determinations has been overcome with respect to all of the withdrawals.

Foster urges that

\* \* \* when the items involved are from a singular source, such as the New York corporate account, justice would demand that a showing of substantial error in the charging of the items as income to the taxpayer should vitiate the general presumption to the contrary \* \* \*. The presumption is a procedural, rather than evidentiary, rule \* \* \*. This should be particularly recognized here where the underlying source was a conceded asset of the corporation, which was concededly used for corporate purposes of both expense and investment.

■ Our understanding of the law with regard to this issue is as follows: The burden of proof is on the Commissioner to show that the taxpayer received income. This burden is initially satisfied, however, by the fact that the Commissioner's deficiency determination is presumed correct. The burden is thus on the taxpayer to prove the incorrectness of the deficiency determination.[16] This burden is procedural and is met if the taxpayer produces competent and relevant evidence from which it could be found that he did not receive the income alleged in the deficiency notice. In other words, the taxpayer at this point has the burden of producing evidence or of going forward with the evidence. If this bur-

den is met, the burden of proof shifts back to the Commissioner to prove the existence and amount of the deficiency.[17]

■ Foster attempts to place himself under this rule by his blanket assertion that, for the years in which deficiencies were found, " \* \* \* the taxpayer did present credible evidence which could have supported a finding that the Commissioner's determination was inaccurate." However, mere inaccuracy of the deficiency determination for a particular year does not affect the presumption with respect to the entire deficiency. It has long been held that if there is more than one item of unreported income in the deficiency determination, the taxpayer's burden of proof must be met with respect to *each* item before the presumption is destroyed for that item. The introduction of evidence from which it could be found that some items were erroneously included in the deficiency notice does not overcome the Commissioner's presumption of correctness with respect to other, separable items.[18] Foster has not shown that he has met his burden as to each item.

None of the cases cited by Foster requires a different result. In both Weir v. Commissioner of Internal Revenue, 283 F.2d 675 (6th Cir. 1960) and Herbert v. Commissioner of Internal Revenue, 377 F.2d 65 (9th Cir. 1966), the taxpayers introduced uncontradicted testimony to the effect that the sums in question were not spent for personal purposes. In both, the Commissioner merely relied on his deficiency determination and introduced no evidence to contradict the taxpayers' assertions. Both courts' decisions simply amount to holdings that

16. Tax Ct.R. 32.

17. E. g., Herbert v. Commissioner of Internal Revenue, 377 F.2d 65 (9th Cir. 1966); Stout v. Commissioner of Internal Revenue, 273 F.2d 345 (4th Cir. 1959); Clark v. Commissioner of Internal Revenue, 266 F.2d 698 (9th Cir. 1959). If the Commissioner introduces no further proof, the case will be decided for the taxpayer. Herbert v. Commissioner of Internal Revenue, supra; Weir

v. Commissioner of Internal Revenue, 283 F.2d 675 (6th Cir. 1960).

18. E. g., Hoffman v. Commissioner of Internal Revenue, 298 F.2d 784 (3d Cir. 1962); Clark v. Commissioner of Internal Revenue, 266 F.2d 698 (9th Cir. 1959); Anderson v. Commissioner of Internal Revenue, 250 F.2d 242 (5th Cir. 1957), cert. denied, 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844 (1958).

the uncontradicted testimony of the taxpayers was such competent and sufficient evidence that the courts could find that the taxpayers had not received income, and, under the general rule, the introduction of such evidence destroyed the Commissioner's presumption of correctness with respect to the particular sums involved. The rule does not apply in this case because, in the words of the Tax Court, "The record in the present case contains no such credible evidence." [19]

### Retsof of Miami, Inc.

Retsof of Miami, Inc. (hereinafter called "Retsof") was organized under the laws of Florida on March 19, 1952, by Whiteside and two other attorneys in his firm. Whiteside was named president and one of the other attorneys secretary. In June 1952 all 100 shares of stock of Retsof were issued to Grant Foster; they remained in his name until June 10, 1957, when they were assigned and transferred to Foster's brother-in-law, Paul Cheesman, as trustee.

Retsof engaged in no real business activity. Its only function seems to have been the ownership of several items of property which were acquired by Retsof with money drawn by Grant Foster from the New York account. These properties consisted of: a 40-acre parcel of land near Mesa, Arizona, onto which Foster's mother and father moved; a house and lot in Miami (the "Hibiscus property"); stock in the Coral Gables National Bank; the Mi Latina, a 35-foot Chris Craft motor yacht docked at the Hibiscus property; a Nash-Healy automobile housed at the Hibiscus property; and a residence in National City, California (the "San Diego property"), purchased for Mrs. Grant Foster's mother, which has been conceded as personal. Also involved are various sums expended in connection with the foregoing properties. Unsecured, non-interest bearing promissory notes, payable to Foster Construction, C. A. were signed by Whiteside on behalf of Retsof to cover the amounts of the major purchases. The Tax Court emphasized that these notes were not "turned over" to Foster Construction, C. A., but were retained by Whiteside. The Retsof sums were held by the Tax Court to be personal expenditures of Grant Foster.

Foster contends on appeal that the Retsof sums, except for those spent for the San Diego property, were expended for legitimate corporate purposes. Positive evidence in the record, however, belies Foster's explanation of the purpose of the Retsof purchases and requires us to hold that the Tax Court's conclusion was not clearly erroneous.

Foster argues that the funds of Foster Construction, C. A. were invested in the Retsof properties in the United States because of the unstable political situation in Venezuela. However, the secretary of Retsof, an attorney in Whiteside's firm, testified that Retsof was organized because "[Whiteside] wanted to be very careful of Mr. Foster not being placed in the position of a resident of the United States. He had a tax situation

19. The entire paragraph reads as follows: "Petitioners' reliance upon Weir v. Commissioner of Internal Revenue, 283 F.2d 675 (C.A. 6), does not require contrary result. The opinion in that case did not indicate that it represented a departure from the general rule reflected in the foregoing cases, and it must be deemed to rest upon its special facts including the Taxpayer's clear and uncontradicted testimony that *he had never received any personal benefit from the checks in question. The record in the present case contains no such credible evidence.*" (Emphasis added.)

Foster asserts that the italicized passages show that the Tax Court required him " * * * to negate that *any* benefit was derived from the New York corporate account rather than show the tax liability determined by the Commissioner to be erroneous." We cannot agree that this was the intention of the Tax Court, since the taxpayer in *Weir* testified that he had never received personal benefit from the *checks in question;* he did not say that he had received no benefit from the *source* of the checks, as Foster's argument contemplates.

of a non-resident citizen. That is why these corporations were brought into being in the first place."

The evidence shows that in early 1952 Foster intended to move his family to Miami. He carried out this intention in September 1952, but Mrs. Foster left because of domestic difficulties in December 1952. In April 1954, Mrs. Foster and the children returned to live in the Hibiscus house. Foster points out that the Hibiscus property was purchased in the spring of 1953, while the Fosters were living apart. He also calls our attention to evidence that the Hibiscus property was used by business associates and employees of Foster Construction, C. A. Strangely, the evidence fails to disclose precisely how much the property was used in entertaining Foster's business associates and how much it was used by Foster's family. However, the record contains ample evidence that Foster intended to use the house for his family and that he in fact did so use the house. The Tax Court's finding that the Hibiscus property was personal is not clearly erroneous.

■■■ We deem it unnecessary to lengthen this opinion by discussing each of the other Retsof properties in detail. Suffice it to say that we are convinced by the highly personal nature of the properties, by the fact that Retsof engaged in no substantial business activity, and by the statement of Retsof's secretary with respect to the reason for the organization of that corporation that the funds spent in the acquisition and upkeep of the Retsof properties represented diversions for Foster's personal purposes.

### Use of Corporate Aircraft

Two hundred and fifty-four checks from the New York account, totaling $468,590.38, were expended in connection with the cost and operation of six aircraft owned by Foster Construction, C. A. Foster stipulated that $100,000.00 of the aircraft expenditures was "attributable to Grant Foster's personal use

of the aircraft" and was "income to Grant Foster * * *." The Commissioner conceded that the remaining $368,590.38 was "not taxable income to Grant Foster * * *." Both parties stipulated that the 254 checks "are no longer in issue in this case." The Tax Court held Foster taxable on this $100,000.00. Foster now attacks this holding.

Foster's stipulation was that the $100,000.00 was "income," not "taxable income." He urges that this distinction was carefully drawn by the parties because the issue of Foster's residence had not yet been decided. According to Foster, the parties contemplated that if Foster were found a resident of the United States, he would be taxable on all his personal income, including the $100,000.00; if Foster were found 'a Venezuelan resident he would be entitled to exclude the $100,000.00 as a fringe benefit along with his salary. Foster claims that the Tax Court "erroneously assumed that the sums stipulated as 'income' to the Taxpayer meant 'taxable income' to him."

We have searched the record before us and the briefs of both parties in a vain attempt to discover a precise, specific statement of the treatment the parties intended to give these personal aircraft expenditures. We agree that the wording of the stipulation is consistent with Foster's contention; it is also consistent, however, with the conclusion of the Tax Court. We have decided that the Tax Court's interpretation should stand, because it is supported by surrounding facts and circumstances in the record. See Hodgson Oil Refining Co. v. United States, 74 Ct.Cl. 303, 304 (1932).

There is nothing inherent in Foster's use of the aircraft which automatically renders it a "fringe benefit." Like all the other personal expenditures involved in this case, the aircraft expenses were paid for by Foster's withdrawals from the New York account. Furthermore, if the parties had really intended to treat the use of the aircraft as a fringe benefit, it would have been a simple matter for them to have said so. The stipula-

tion, however, is absolutely silent about fringe benefits. This silence speaks volumes about what the parties intended, especially in view of the parties' explicit statement that, because of the stipulation, the checks were no longer an issue in the case.

Moreover, if the parties had intended to hold the aircraft expenditures taxable only as a fringe benefit, it strikes us as exceedingly strange that similar treatment was not accorded the other substantial fringe benefits which Foster, according to his own evidence, received during these eight taxable years while he was a resident of Venezuela. Yet, according to Foster's Reply Brief, "Though these fringe benefits were known to exist, the Commissioner never questioned the tax-free character of the items and they formed no part of the issues in this case."

In 1954 and 1956 the amount of personal withdrawals, not including the personal aircraft expenses, did not exceed Foster's excludable salary. Yet, in these years Foster was taxed on these aircraft expenses to their full extent. Foster claims that if we hold the personal airplane expenses to be taxable income, these sums should be applied against his excludable salary in accord with paragraph 24(c) of the Stipulation, which provides that before certain of Foster's concededly personal withdrawals may be applied against his excludable salary,

> * * * there must first be applied against such salary any other amounts shown to have been paid to him as such or distributed to him or withdrawn by him in any other manner so as to constitute taxable income to him * * *.[20]

■ No reason is apparent from the Tax Court's opinion why these airplane expenses were not applied to excludable

salary in 1954 and 1956. The record indicates, however, that this treatment was decided on by the parties themselves in their agreed computation under Rule 50 [21] pursuant to and in accord with the decision of the Tax Court. Foster failed to question this treatment in his objections to the Commissioner's Rule 50 computations below, and he ultimately agreed to the computations in their entirety.[22] He raises the point for the first time on this appeal. We think Foster is estopped to make this argument now. It would frustrate the purpose of Rule 50 to allow Foster to challenge on appeal what he has agreed to in the court below.

### Failure to Offset Undrawn Salary

In 1950 and 1954 the amount of Foster's excludable salary exceeded the amount of personal withdrawals from the New York account. Foster argues that Stipulation 24(c) requires that the undrawn salary be applied against the withdrawals of the subsequent years 1951 and 1955.

Stipulation 24(c) reads in pertinent part as follows:

> The respondent concedes that, to the extent of Grant Foster's excludable salary * * * the Court may find as a fact that the aggregate amount of * * * [certain withdrawals conceded personal by Foster] with respect to any year may be applied against Grant Foster's salary for such year and/or his unpaid salary for prior years * * *.

■ The Tax Court refused to offset the undrawn salary in 1950 and 1954 against the withdrawals in 1951 and 1955. We think the Tax Court was correct in so doing. The stipulation that "the Court *may* find as a fact that * * [withdrawals] *may* be applied against

20. See note 6, supra.

21. Tax Ct.R. 50.

22. It was in his objections to the Rule 50 computation that Foster first argued that the airplane expenditures were excludable fringe benefits. The Tax Court could not consider this argument, however, because argument is limited under Rule 50 to matters regarding computation; issues previously decided by the court cannot be raised again, nor can new issues be raised. Tax Ct.R. 50(c).

* * * unpaid salary for prior years" (emphasis added) certainly does not compel the Tax Court to carryover unpaid salary. The stipulated excludable salary was based on the amount Foster had reported in his Venezuelan income tax returns for the years in question, and, as the Tax Court reasoned, it is "highly improbable" that Foster would have reported and paid taxes on income that he had not in fact received.

In his Reply Brief, Foster argues that the Tax Court's determination cannot stand because there were no pleadings on the issue of whether Foster had received income from sources other than the New York account. We see no merit to this argument. The Commissioner's pleadings asserted deficiencies for 1950 and 1954. The burden of proof was on Foster to disprove these determinations. The evidence included Foster's sworn statement in his Venezuelan tax returns that he had *received* the specified amounts. The evidence also showed that Foster had access to assets of the corporation other than the New York account. No evidence was presented that Foster did not derive part of his salary from other sources. To uphold Foster's argument would require our reversing the Tax Court on a conclusion which is supported by the pleadings, the presumption of the Commissioner's correctness, and positive evidence that Foster had received his full salary.

### 1955 Redeposit

 Foster argues that the amount of his taxable income in 1955 should be reduced by $32,396.71. This sum represented a redeposit of funds previously diverted from the New York account. These funds have already been held taxable to Foster in the years in which the diversions were made. Foster now asserts that, since this money has already been taxed to him as personal income, the redeposit in the New York account in 1955 should be treated as a deposit of his personal funds and that the amount of personal withdrawals taxed to him in that year should be reduced by the amount of his personal deposits. We agree. The Commissioner's reply, that "these deposits were, apparently, considered by the Tax Court as having been offset by withdrawals in Venezuela," is not persuasive. The Tax Court made no such positive finding. The cause is remanded for a redetermination of the deficiency for 1955 in accord with this decision. In all other particulars, the case is affirmed.

Affirmed in part, reversed and remanded in part.