RAWLIN L. STOVALL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stovall v. Commissioner
Docket No. 1011-77.
United States Tax Court
T.C. Memo 1983-450; 1983 Tax Ct. Memo LEXIS 341; 46 T.C.M. (CCH) 894; T.C.M. (RIA) 83450; July 28, 1983. Lorraine Woods, for petitioner. James D. Harbert and Harmon B. Dow, for respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge:* Respondent determined deficiencies in and additions to petitioner's Federal income tax for 1972 and 1973 *342 in the following amounts: Additions to Tax
Year
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a)
1972
$1,386,664
$346,666
$69,333
1973
4,065,155
1,016.289
203,258
After concessions, the issues remaining for determination are: 1. Whether amounts paid to petitioner in 1972 by investors as margin deposits for commodities transactions constitute taxable income to petitioner; 2. Whether amounts paid to petitioner's corporation in 1973 by investors as margin deposits for commodities transactions constitute taxable income to petitioner; 3. Whether interest paid in 1973 on investments purchased with margin deposits paid to the corporation but held in petitioner's name is taxable to petitioner; 4. Whether petitioner's failure to file timely returns in 1972 and 1973 was due to reasonable cause; and 5. Whether any underreporting of income by petitioner in 1972 and 1973 was due to negligence. *343 FINDINGS OF FACT This case was stipulated in part and the several stipulations of fact and exhibits attached thereto are incorporated herein by this reference. Petitioner Rawlin L. Stovall resided in Miami, Florida, when he filed his petition herein. During the years in issue he resided in Chicago, Illinois. Petitioner's Business Activities
In 1972, petitioner was the president and principal shareholder of Stovall and Stovall, Inc., which was a futures commission merchant registered under the Commodity Exchange Act, 7 U.S.C. sec 1 et seq. ("the Act"). Petitioner was a registered floor broker and a member of the Chicago Board of Trade and the Chicago Open Board of Trade (now the Mid-American Commodity Exchange) during the years in issue and for some time previous thereto. Petitioner transacted business in 1972 through Stovall and Stovall, Inc. and under the name R. L. Stovall, Sole Proprietor, Principal in Cash Commodities. The 1972 activities comprising the foundation of this controversy were conducted by petitioner in his capacity as a sole proprietor. Petitioner was not personally registered under the Act as a futures commission merchant. *344 In 1972, petitioner began marketing an investment program "for individuals, partnerships, and corporations who wish to take advantage of the opportunities for large profit potentials in the field of 'cash commodities.'" An initial deposit of $2,000 would open a margin account for the investor and provide the good faith money for leveraged purchases of "cash commodities for deferred delivery." The investor would execute three documents -- a self-perpetuating "terms of purchases and/or sales of cash commodities for deferred delivery" (the "purchase agreement"), a management contract providing an agent for "professional assistance," and a trading authorization "giving the firm of R. L. Stovall the authorization to accept buy and sell orders for you." The purchase agreement was for 2 years and required the customer to leave any profits accruing to his account in the account with petitioner. (By this, petitioner represented, the investor could defer taxes on initial profits.) A handling fee of $30 per trade would be charged to the depositor's account by petitioner if the transaction yielded sufficient profits to cover it. The margin deposits were refundable, however, provided the customer's *345 account was not "open." [2]
Petitioner began acting on behalf of customers and accepting their checks for margin deposits in January 1972. The checks were made to the order of petitioner and deposited with various financial institutions in accounts established in petitioner's name. He also began recruiting "independent contractors" who would solicit customers to trade with petitioner and obtain the above-described signed contracts from them. Checks from depositors made payable to an independent contractor were endorsed and turned over to petitioner by the contractor and deposited in accounts in petitioner's name. Trading activities on behalf of depositors were instituted by petitioner and reported to depositors on statements prepared by petitioner or his employees. Petitioner did not, however, enter his customers' purchase and sale orders on the competitive floor of an authorized board of trade, as required by law. Instead, he traded with himself for his depositors by taking the opposite side of his customers' orders -- *346 orders that he, as authorized trading agent, was initiating. A depositor would learn of the trades made on his behalf when he received the statements prepared by petitioner. In July 1972, petitioner enlisted Frank Hackbarth to serve as "trading agent" between the investors and petitioner, and new contracts executed by petitioner's customers included authorization for Hackbarth to trade for them. Hackbarth was not compensated for acting as trading agent. Petitioner also retained Hackbarth's company, International S.C.O.P.E.S., to prepare computerized statements of account. The information reported by the statements to the customers was provided weekly to Hackbarth on slips of paper transmitted by petitioner. The computer printouts were then delivered to petitioner, who sent them to his customers. The statements reflected the net balance in the account and any open positions, purchases, sales, profits or losses, or fee charges generated during the statement period. Although Hackbarth was supposed to be trading on behalf of the depositors, he did not personally communicate with the depositors. Instead, he or petitioner would call the other and propose a trade. As previously *347 stated, the orders were not actually traded on the commodities market, but were merely placed with petitioner. Each time Hackbarth executed a trade, petitioner benefitted, at the expense of the depositor, by a gain on the transaction or the charge of a handling fee. In January 1973, American Cash Commodities of Missouri, Inc. ("American" or "the corporation"), was incorporated by petitioner's brother, William A. Stovall, and petitioner's attorney, Jack V. Hoskins. The corporation was formed to enable petitioner to continue his "cash commodities" business in a new capacity. The incorporators were the initial shareholders, but shortly after incorporation petitioner acquired control of American and served as its president. Customers' funds on deposit with petitioner were transferred to American's bank accounts, along with petitioner's "equity" in these deposits of an undetermined amount. [3]The corporation employed several persons in clerical capacities. Thereafter, petitioner's customers traded with American pursuant to contracts between the customers and the corporation, with Hackbarth acting as trading agent on behalf of petitioner's customers and petitioner acting as trading *348 agent for the corporation. During 1972 and 1973, petitioner opened and maintained as many as 14 accounts with several banks and savings and loan associations in the Chicago area. [4] All of the 1972 accounts except for one opened in November 1972, were maintained in the petitioner's name individually. One account with Continental Illinois National Bank and Trust Company of Chicago (Continental), opened in January 1973, was in American's name and petitioner was the authorized signatory for the account. In addition, American had an account with Telegraph Savings and Loan Association from January 19, 1973, through July 25, 1973. The funds deposited to these accounts were derived solely from customers' deposits with petitioner and interest paid on the deposits by the various institutions. *349 Throughout the years in issue petitioner made many withdrawals from the bank accounts, but not to pay for commodities bought by depositors. In January 1973, petitioner purchased five 6-month Treasury bills at a total cost of $484,547.19. [5] In April 1973 petitioner purchased in his own name eight certificates of deposit from Continental with a total face value of $900,000, apparently by utilizing checks payable to petitioner drawn on American's checking account with Continental. Checks totaling $3,910,574 payable to petitioner were drawn on American's account with Continental in 1973. Also in 1973, petitioner transferred $148,000 from American's bank account to his brother-in-law's corporation, Robert S. Yowell & Associates. The funds were used to build houses in Virginia, the titles to which were ultimately vested with petitioner's sister. In addition, petitioner transferred a total of $14,000 to Larry Roe, Cephus Cannon, and Ed *350 Richter, again from money deposited with American by petitioner's customers. He also paid himself sums with which to purchase silver for his own account with James T. McKerr & Co.[6]The corporation was not provided with security or promissory notes for these transfers. In either July or August 1973, petitioner, apparently with funds previously withdrawn from American, purchased certificates of deposit worth $6.55 million from Continental Bank in American's name. These amounts remained in American's name until seized by the court in a civil case later brought by depositors against petitioner, American, and others. See pp. 14 - 15 infra.
Operating expenses of petitioner's commodities business were paid from the deposits, as were petitioner's legal fees and a bail bond. Petitioner did not maintain a general ledger, a cash receipts book, a cash disbursements book, a complete list of depositors, or a complete list of deposits to enable him to account for the precise *351 location and use of the deposits. Petitioner did not compile records that could readily provide information regarding the precise amount of his own or his customers' equity in the accounts. In 1972, petitioner directly or indirectly received at least $2,181,745.28 from investors and refunded $56,423.50 to them. He paid $17,733 in operating expenses and $122,838 in commission expenses. In addition, petitioner has conceded that in 1972 he realized a net short-term capital gain of $4,573.65 from trades with registered commodity futures merchants, and that he had interest income of $18,531. In 1973, depositors paid at least $7,303,693.13 to American and received $672,241.13 in refunds. American paid $246,831 in operating expenses, $221,070 in deductible legal fees, $41,708 in interest expenses, and $870,960 in commission expenses. Petitioner realized a net short-term capital gain from trades through registered commodity futures merchants in the amount of $3,462. On December 31, 1973, petitioner's account with James T. McKerr and Co. had an equity balance of $176,934.31, which funds were then under the control of the U.S. District Court for the Northern District of Illinois pursuant *352 to a court order dated September 28, 1973. The total amount of interest paid in 1973 to petitioner or American on investments purchased with depositors' funds was $240,471.16. Upon the request of his accountant, petitioner received an extension of time until June 15, 1973, in which to file his 1972 Federal income tax return. Petitioner did not, however, file a return for 1972. Petitioner was also granted an extension of time until September 15, 1974, in which to file his 1973 return, but the Form 1040 filed on behalf of petitioner did not contain any information from which petitioner's 1973 tax liability could be determined. The Administrative Proceedings
Acting pursuant to information provided by one of petitioner's customers, the Commodity Exchange Authority [7] (CEA) in December 1972, began an investigation into petitioner's commodities activities. An officer of the CEA telephoned petitioner on December 6, 1972, and requested petitioner to provide his books and records to the CEA. At that time petitioner stated that he was selling "cash commodities for deferred delivery," denied that his activities were within the purview of the CEA, and refused to provide the requested *353 documents. By a letter that same date, petitioner notified the CEA that, effective immediately, he was no longer in the cash commodities business. Nonetheless, the investigation continued, and a complaint charging petitioner with several violations of the Commodity Exchange Act, 7 U.S.C. sec. 1 et seq. (the "Act") was filed by the CEA in January 1973.
In the complaint filed by the CEA, petitioner and Stovall and Stovall, Inc. were charged with numerous violations of the Act during the period from May 3, 1972, to December 6, 1972. Full evidentiary hearings were held in January 1975, April 1976, and September 1976; petitioner was represented by counsel at these hearings. Briefs were submitted by both sides and oral *354 argument was heard on April 19, 1977. On May 6, 1977, the initial decision and order of the administrative law judge was promulgated. The administrative court held that petitioner was guilty of violating various provisions of the Act after finding that petitioner dealt in commodity futures contracts without being registered to do so, failed to execute futures contracts on a designated contract market, and "took the opposite side of a customer's order when acting as agent for the customer on one hand and as the principal for his own account on the other" without clearly identifying himself as the opposing principal. These activities were in violation of section 4 of the Act and petitioner and Stovall and Stovall, Inc., had their registrations revoked. In addition, petitioner lost his trading privileges for 2 years. Petitioner appealed the decision of the administrative law judge to the full Commodity Futures Trading Commission (CFTC), which heard the appeal but specifically adopted the findings of fact of the administrative law judge. The CFTC held that petitioner violated section 4 of the Act, which requires that all contracts for the sale of commodities be executed by or through *355 a contract market member and on a contract market designated by the CFTC. The commissioner extended petitioner's loss of trading privileges to 5 years, however, after determining that the initial sanction was too lenient. On December 6, 1979, the CFTC entered its opinion and order, which became final on or about December 21, 1979. The Criminal Charges
On September 6, 1973, the July 1973 Grand Jury sitting in the Northern Judicial District of Illinois, Eastern Division, returned an indictment against petitioner and against American charging both petitioner and American with criminal violations involving mail fraud relating to petitioner's activities in "cash commodities" and charging petitioner with perjury in connection with the Grand Jury's investigation. On January 14, 1974, petitioner, American, and the United States Attorney filed a plea agreement in the criminal case. Under the agreement, petitioner agreed to plead nolo contendere to the 25 counts involving mail fraud and guilty to one count of perjury. American agreed to plead guilty to 19 counts of mail fraud. Petitioner was placed on probation for 5 years and as conditions thereof was prohibited from trading *356 in commodities and ordered to make restitution. The Civil Lawsuit
About the time the Grand Jury's indictment was returned, various civil suits were filed in the United States District Court for the Northern District of Illinois against petitioner and American by their customers. These suits were consolidated into a civil class action suit styled "John Patterson, et al. v. Rawlin L. Stovall." On or about September 13, 1973, funds on deposit with Continental Bank were impounded by the court hearing the civil suit and held for the benefit of the class.The amounts on deposit consisted of $6,550,000 in certificates of deposit and a checking account balance of $324,549.32., all maintained in the name of American. In August 1974, a proposed class action settlement agreement was presented in the civil case. By the terms of the proposed agreement, the funds held by Continental, which had earned approximately $700,000 in interest since being seized, were divided into two groups -- Settlement Fund A, consisting of at least $6,500,000, established for reimbursement of the class, and Settlement Fund B, consisting of approximately $1,000,000. On February 20, 1975, the settlement was *357 approved by the District Court. Several of petitioner's customers filed objections, but the settlement agreement was upheld and the funds ultimately distributed pursuant to the direction of the court. OPINION The deficiency notice issued by respondent charged petitioner with income in 1972 and 1973 equal to the net amounts received for investment in commodities, which respondent claims petitioner converted to his own use. Certain business deductions resulting from operating his commodities business, in addition to various other deductions, were allowed to petitioner. [8] Respondent's argument in this case is that petitioner operated a commodities "scheme" whereby he, or individuals recruited by him, solicited funds to be placed with him or his corporation for investment in the commodities market. Respondent contends that petitioner's activities were fraudulent, and that, therefore, the proceeds of the activities are income under James v. United States,366 U.S. 213 (1961). The corporate entity organized and operated by petitioner throughout 1973 was in furtherance of this fraudulent scheme and a sham, asserts respondent, and should be disregarded for purposes *358 of determining the 1973 tax liability. Petitioner claims that all funds received from investors were necessary to protect petitioner against losses incurred through the credit trading of customers and were invested on their behalf pursuant to the rules then in effect and thus are not taxable to him. Petitioner further maintains that his corporation was a viable entity, taxable separately from him, and that it conducted legitimate business activities. The 1972 Deficiencies
After full evidentiary hearings at which petitioner was represented by counsel, the administrative law judge specifically found that petitioner operated a "bucket shop" by taking the opposite side of his customers' purchase and sale orders for commodities futures, and that petitioner did not actually trade his customers' orders on a registered trading floor. These findings were specifically adopted by the CFTC after an appeal by petitioner, and petitioner has conceded that the determination of the CFTC is conclusive and binding on petitioner herein. Notwithstanding his *359 concession, however, petitioner argues that the findings of the CFTC are of no use in the instant case because the doctrine of collateral estoppel does not apply to decisions of administrative agencies. In United States v. Utah Construction and Mining Co.,384 U.S. 394 (1966), however, the Supreme Court held that the doctrine of collateral estoppel is applicable to factual determinations made by an administrative agency (1) acting in a judicial capacity, (2) resolving disputed issues of fact properly before it (3) that the parties have had an adequate opportunity to litigate. (Petitioner agrees that respondent is in privity with the complainant in the CFTC proceedings.) The first criterion for the applicability of the doctrine of collateral estoppel to administrative actions is that the agency in question be acting in a judicial capacity, which may be defined as the conduct of "proceedings designed to adjudicate disputed facts in particular cases." United States v. Florida East Coast R. Co.,410 U.S. 224, 245 (1973). In petitioner's case before the CFTC, *360 the proceeding was initiated to determine whether petitioner had violated certain sections of the Commodity Exchange Act. "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." Prentis v. Atlantic Coast Line Co.,211 U.S. 210, 226 (1908). The CFTC proceedings were specifically directed at petitioner and addressed his acts and omissions of the past; they were "not for the purpose of promulgating policy type rules or standards," which is the function of rulemaking. Id. Thus, the CFTC was acting in a judicial capacity. The second prerequisite for collateral estoppel, that the agency be resolving disputed issues of fact properly before it, addresses the subject matter jurisdiction of the agency. Before amendment by the Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (1974), section 6(b) and 6(c) of the Commodity Exchange Act, 7 U.S.C. secs. 9, *361 13b, authorized the Secretary of Agriculture to proceed administratively against any person who he believed was violating or had violated any of the provisions of the Commodity Exchange Act. As set forth in the complaint initiating the administrative proceeding, the Secretary of Agriculture did have reason to believe that petitioner had violated provisions of the Commodity Exchange Act. Thus, there was subject matter jurisdiction in the administrative proceeding as it was originally initiated. Upon the establishment of the Commodity Futures Trading Commission on April 21, 1975, all administrative actions brought under the Commodity Exchange Act by the Secretary of Agriculture were transferred to the Commission. See Pub. L. No. 93-463, secs 411, 412, 88 Stat. 1389 (1974). As a result, the CFTC had subject matter jurisdiction over the factual issues presented in the administrative proceeding. The final requirement for the applicability of the doctrine of collaterial estoppel set forth in Utah Construction and Mining Co.,supra, is that the parties must have had an adequate opportunity to litigate the factual issues now claimed to be in repose. Petitioner was represented *362 by counsel before the administrative law judge and before the full CFTC. He presented evidence and argument directed at determining whether he violated the provisions of the Commodity Exchange Act in issue. Furthermore, he had substantial rights accorded him in conducting the litigation before the CFTC, such as a right to an unbiased judge, the right to subpoena witnesses for testimony and for the production of documentary evidence, and the right to make objections. See generally, Commodities and Securities Exchange, 17 C.F.R. sec. 0.0 et. seq. (1975); 17 C.F.R. sec. 10.1 et. seq. (1980). In addition, the burden of proof in that proceeding was on the complainant and not on petitioner. Because the factors set forth by the Supreme Court in Utah Construction and Mining Co. are present here, we have incorporated the CFTC's findings, where relevant, into our own. In his notice of deficiency with respect to 1972, respondent charged petitioner with income equal to net receipts from customers. These receipts were paid to petitioner as margin deposits for customer trading accounts, and the amount and fact of receipt are not in issue. *363 Normally, amounts representing margin deposits from customers received by a futures merchant are not taxable as income to the futures merchant because he is acting as an agent on behalf of the customer and merely holding the funds for the use of the customer in guaranteeing his trading margin. We must therefore ascertain whether petitioner's activities with respect to these deposits were inconsistent with the customers' ownership interests therein. The language of section 61, "all income from whatever source derived," has been held to encompass within the definition of gross income all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 431 (1955). The Supreme Court held in James v. United States,supra at 219, that amounts received "without the consensual recognition, express or implied, of an obligation to repay, and without restriction as to their disposition" constitute *364 income to the recipient "even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.", quoting North American Oil Consolidated v. Burnet,286 U.S. 417, 424 (1932). A gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Rutkin v. United States,343 U.S. 130, 137 (1952). It is the economic benefit accruing to the taxpayer that is the controlling factor in determining whether a particular gain is "income." Commissioner v. Glenshaw Glass Co.,supra.
Petitioner exercised "complete dominion" over the funds within the meaning of Glenshaw Glass by virtue of the following: 1. He had unfettered physical access to the funds on deposit; 2. He, or persons controlled by him, had the authority to make trades on behalf of the accounts; 3. He had the complete ability to manipulate the trades to derive personal profit at the expense *365 of the depositors, and 4. He had the ability to, and actually did, divert funds to his own use. Thus, petitioner derived "readily realizable economic value" from the funds on deposit. Petitioner admitted that he acted as the opposing principal for the trades made on behalf of his depositors. Petitioner was simultaneously instigating the depositors' trading activities by acting as trading agent for depositors or by controlling the activities of the designated trading agent. None of the trades reflected on the depositors' statements of account were actually entered on the competitive floor of a regulated trading market; they were merely bookkeeping entries. This arrangement gave petitioner extraordinary control over his customers' deposits and unlimited potential for personal economic benefit because petitioner could arbitrarily determine whether he or his customer would make the profit on any single transaction. Petitioner thus had the full economic benefit of the deposits. Other examples of petitioner's conduct that are inconsistent with his contention that he was merely holding money on behalf of another can be seen in his failure to observe the Federal regulations with *366 respect to handling customer deposits. The regulations in effect in 1972 required that all money received by futures commission merchants to margin, guarantee, or secure trades, and all money accruing to customers as a result of trades, be separately accounted for and segregated as belonging to such customers. These sums had to be deposited with a financial institution in accounts clearly reflecting customer ownership of the amounts therein. Commodity and Securities Exchange, 17 C.F.R. sec. 1.20(a) (1972). The regulations also required the books and records of a futures commission merchant to reflect accurately his interest in customer's segregated funds. Id.,sec. 1.23. Although funds held for customers could be invested in Federal, state, or local government obligations, the futures commission merchant was required to "separately account for such obligations, * * * [to] segregate *367 such obligations as belonging to such customer * * * [and to deposit the obligations] under an account name clearly show[ing] that they belong to commodity customers * * *" Id.,sec. 1.26. Petitioner complied with none of these requirements. The funds were deposited in accounts bearing only petitioner's name, and the investments purchased were also in petitioner's name. In addition, petitioner failed to keep records that would reflect accurately his equity in his customers' accounts. Petitioner testified at trial that he believed he had equity in his depositors' accounts, but he did not knew how much. This behavior is not indicative of a true agency or proper commodity broker relationship with respect to the funds. Rather, petitioner exercised such dominion and control over his customers' deposits that said deposits constitute income to him under section 61. Petitioner argues that he was operating a bona fide cash commodities business and points to the refunds of deposits made by him to support that claim. The opinion of the CFTC rejects petitioner's contention; even without the collateral estoppel effects of the previous decision, however, we would not be convinced *368 of the bona fides of petitioner's operation simply because he refunded what amounts to less than 3 percent of the sums paid to him. The repayments here enabled petitioner to continue his operations and do not evince the recognition of an obligation to repay that is necessary to refute respondent's characterization of the deposits as income to petitioner. See United States v. Rosenthal,470 F.2d 837, 842 (2d Cir. 1972). The 1973 Deficiencies
In December 1972, petitioner was notified that his commodities activities were being investigated by the Commodity Exchange Authority. Petitioner then told the CEA that he was quitting the commodities business. Shortly thereafter, in January 1973, he caused the formation of American Cash Commodities of Missouri, Inc. Petitioner's purpose in forming American was, inter alia, to incorporate the commodities activities petitioner had conducted in 1972 in a sole proprietorship capacity. During 1973, American entered into trading agreements with customers, hired and paid employees, maintained bank accounts, defended a civil lawsuit, was indicted, and entered a plea agreement. The corporation was formed for a business purpose *369 -- to conduct the commodities transactions that petitioner could not conduct individually -- and actually engaged in business activities. As the Supreme Court stated in Moline Properties, Inc. v. Commissioner,319 U.S. 436, 438-439 (1943): The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to grain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creditor's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. [Footnotes and citations omitted; emphasis supplied.] Thus, given either of the alternative requisites of business purpose or business activities, the corporate entity will be accorded recognition. Jackson v. Commissioner,233 F.2d 289 (2d Cir. 1956), affg. 24 T.C. 1 (1955). As to the latter requirement, the quantum of activity prescribed *370 may be minimal. Britt v. United States,431 F.2d 227, 235 (5th Cir. 1970); Strong v. Commissioner,66 T.C. 12, 24 (1976), affd. 553 F.2d 94 (2d Cir. 1977). For our purposes in this case, the activities engaged in by American were sufficient to require its recognition as a taxable corporation. Respondent argues that American's activities consisted entirely of a scheme to defraud and such activities do not comprise "business" activity within the ordinary meaning of the word.Respondent stipulated, however, that the corporation was formed to enable petitioner to continue his commodities activities. The fact that the business was not operated in conformity with Federal regulations does not negate the corporate existence of American for tax purposes. Respondent did not issue a notice of deficiency to American charging it with income equal to net receipts from investors in 1973, and then charge petitioner individually with dividend income by virtue of his withdrawals and diversion of funds from the corporation. Instead, respondent chose to ignore the corporate entity and attribute the income directly to petitioner. Because the corporation *371 was a separate taxable entity in 1973, we cannot conclude that petitioner realized the margin deposit income attributed to him in the notice of deficiency.The deposits were paid to American, not to petitioner. Petitioner's withdrawals and diversions of funds from the corporation could be characterized as income to him under a constructive and/or actual dividend theory. Such amounts would include the interest paid on assets petitioner purchased in his own name with corporate funds because petitioner has not demonstrated that such assets were held on behalf of the corporation. But he repaid the amounts to the corporation in the same tax year by purchasing certificates of deposit worth $6,550,000 in American's name. The amount of repayment exceeds the amount potentially taxable as dividends to petitioner, [9] thus reducing the amount of dividend income realized to zero. [10] See Foster v. Commissioner,391 F.2d 727, 739 (4th Cir. 1968), affg. in part and revg. in part a Memorandum Opinion of this Court; Leaf v. Commissioner,33 T.C. 1093 (1960), affd. 295 F.2d 503 (6th Cir. 1961). *372 Inasmuch as American was not a sham corporation we need not decide whether the amounts seized in September 1973, by the court are deductible in 1973 when seized or in 1974 when the settlement was reached, because any resulting deduction would belong to the corporation, who is not a party to this action.For the same reason, we do not consider petitioner's claim of entitlement on behalf of American to a deduction for the alleged obsolescence of a computer purchased by American in 1973.
Additions to Tax
In his notice of deficiency, respondent determined additions to tax under section 6651(a) for petitioner's failure to file timely his tax returns for 1972 and 1973, and under section 6653(a) for negligent or intentional disregard of rules and regulations. Petitioner bears the burden of proof on both of these issues. See Bixby v. Commissioner,58 T.C. 757, 791 (1972); Fischer v. Commissioner,50 T.C. 164, 177 (1968). Petitioner did not file a return for 1972 and claims that he reasonably relied on the advice of his accountant, Leroy Briggs, who advised *373 that no return need be filed. Mr. Briggs died shortly after the 1972 return was due, but, even if we were to believe that Mr. Briggs conveyed such advice, we could not find that petitioner reasonably relied on it because petitioner has not proved that he provided his accountant with all the information relevant to the determination of his 1972 tax liability, viz., the true nature and extent of his commodities activities. To demonstrate reasonable reliance, it must be shown that the advisor had sufficient knowledge of the taxpayer's relevant financial circumstances to make an informed decision. Yale Avenue Corp. v. Commissioner,58 T.C. 1062 (1972); Fourth and Railroad Realty Co. v. Commissioner,25 T.C. 458 (1955). Respondent's determination under section 6651(a) will therefore be sustained with respect to 1972. With respect to the addition to tax under section 6653(a) for 1972, petitioner's failure to keep adequate books and records as required by section 6001 and the regulations thereunder is clearly negligence. See Gilman v. Commissioner,72 T.C. 730, 751 (1979). *374 The addition to tax for negligence may be cumulated with the addition to tax under section 6651. Robinson's Dairy, Inc. v. Commissioner,35 T.C. 601, 609 (1961), affd. 302 F.2d 42 (10th Cir. 1962). Sections 6651(a) and 6653(a) provide for additions to tax based on the amount of tax due on the return. Inasmuch as we have held for petitioner on the 1973 deficiency tried herein, petitioner is not liable for the late filing addition or the negligence addition for 1973. [11]Crowley, Milner and Co. v. Commissioner,76 T.C. 1030 (1981), affd. 689 F.2d 635 (6th Cir. 1982). Decision will be entered under Rule 155.
Footnotes
*. This case was tried before Judge Sheldon V. Ekman, deceased, and thereafter reassigned by order of the Chief Judge to Judge Mary Ann Cohen↩ for disposition. 1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. An account would be "open" if, e.g., a purchase order had not yet been offset by either the depositor's receipt or sale of the purchased commodity.↩
3. In the various legal proceedings generated by petitioner's commodities activities, he has consistently maintained that he had an "equity" position with respect to his customers' deposits resulting from his own gains in trading with customers' accounts and from unpaid but accrued handling fees owed to him by his customers.↩
4. In addition, petitioner individually maintained trading accounts with three brokerage firms, James T. McKerr & Company, Rosenthal & Company, and R.J. O'Brien & Company.↩
5. It is not clear from the record whether these assets were purchased in petitioner's name individually or in the name of American; they were not identified on the bank records as belonging to petitioner's or American's customers, however.↩
6. Presumably the funds used by petitioner to maintain his personal commodities accounts were derived from the amounts paid petitioner by a draft on American's account; the record is unclear on this point.↩
7. The Commodity Exchange Authority of the Department of Agriculture was, during the years in issue, the regulatory agency charged with administering the Commodity Exchange Act, 7 U.S.C. sec. 1 et. seq.↩ On October 23, 1974, Congress enacted legislation creating the Commodity Futures Trading Commission, an independent regulatory agency, which on April 21, 1975, succeeded to the operations of the Commodity Exchange Authority.
8. Additional income items were charged to petitioner for 1972 and 1973 and have been conceded, except for interest for 1973.↩
9. Net receipts from depositors ($6,631.452) plus interest earned on the deposits ($240,471.16) less the deductions allowed by respondent ($1,380,569) equals $5,491,354.16. Petitioner repaid at least $6,550,000 to American in July or August 1973, a portion of which constitutes a contribution to capital. ↩
10. Evidence in the record suggests that petitioner withdrew a total of $20,648 in 1972-1973 from his commodities business as "personal expenses and drawing." It can not be determined from examining the notice of deficiency whether or not this amount has already been included by respondent in his calculations, however, and respondent has not separately addressed this item in his briefs. We, therefore, make no independent finding with respect to this amount.↩
11. See 572 South Salina Corp. v. Commissioner,↩ a Memorandum Opinion of this Court dated Apr. 30, 1953.