JOHN P. LONGSTAFF AND VIRGINIA LONGSTAFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Longstaff v. Commissioner
Docket No. 2526-86.
United States Tax Court
T.C. Memo 1988-75; 1988 Tax Ct. Memo LEXIS 101; 55 T.C.M. (CCH) 205; T.C.M. (RIA) 88075; February 24, 1988; As amended February 29, 1988 Davie E. Gray and Gary R. Case, for the [Text Deleted by Court Emendatiion] *102 petitioners. Brett J. Miller and Reid M. Huey, for the [Text Deleted by Court Emendation] respondents. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: This case was assigned to Special Trial Judge Daniel J. Dinan pursuant to the provisions of section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub. L. 99-514, section 1556, 100 Stat. 2754) and Rule 180 et seq. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE DINAN, Special Trial Judge: Respondent determined the following deficiencies and additions to petitioners' Federal income taxes: Additions to Tax
Year
Deficiency
Section 6653(b)
1979
$ 59,796.00
$ 29,898.00
1980
8,138.17
4,069.00   1982
1,131.00
--
The sole issue for decision is whether petitioners are liable for *103 the additions to tax determined under section 6653(b) for 1979 and 1980. [2]
FINDINGS OF FACT Many of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioners, Dr. John P. Longstaff and Virginia Longstaff, are husband and wife. They filed joint Federal income tax returns for each of the years in issue with the Internal Revenue Service Center at Memphis, Tennessee. Their 1979 return was filed on June 4, 1980. Their 1980 return was filed on April 23, 1981. Notices of deficiency pertaining to all years were issued on December 2, 1985. The notice of deficiency for 1979 was issued more than three, but less than six, years after the return for that year was filed. For 1980, petitioners and respondent executed two valid and timely Forms 872 extending the period of limitations on assessments until and including December 31, 1985. *104 At the time the petition in this case was filed, petitioners resided in Evansville, Indiana. For convenience, John Longstaff will be referred to as Longstaff or petitioner, and Virginia Longstaff will be referred to as Mrs. Longstaff or petitioner's wife. Petitioner is a physician duly licensed to practice general medicine in the State of Indiana and Board Certified in the speciality of psychiatry. Petitioner was so licensed and actively practiced psychiatry during 1979 and 1980. Petitioner's practice during those years consisted of seeing patients privately and working for the State of Indiana. He was also an assistant professor of psychiatry at Indiana University's Medical School during the years in issue, and was a member of several professional associations including the American Medical Association, Kentucky Psychiatric Association, Southern Psychiatric Association, and American Psychiatric Association. Most of petitioner's private practice was conducted from the offices of Dr. H. Jerome Reitman under a verbal agreement whereby Dr. Reitman provided all clerical, administrative, and support functions in exchange for 25 percent of petitioner's billings. Dr. Reitmam maintained *105 exclusive dominion and control over the offices. Petitioner did not otherwise pay rent, telephone, utilities, or any other expenses associated with his private practice of psychiatry except for his own vehicular transportation. As a general rule, petitioner saw patients at the Reitman offices on Mondays, Tuesdays, and Thursdays. Petitioner was not a salaried employee of Dr. Reitman, who, at all times during the years in issue, held petitioner out to the public as an independent contractor. Dr. Reitman did not withhold tax, social security (FICA), or unemployment contributions (FUTA) from monies disbursed to petitioner in 1979 or 1980, nor did he maintain any type of benefit package, including medical or disability, for petitioner, his wife, or any members of petitioners' family. Except for a small "cushion" of $ 500 retained in a joint account, Dr. Reitman was a conduit of the fees generated by petitioner's private practice carried on out of Dr. Reitman's offices. All funds disbursed by Dr. Reitman to petitioner were deposited into a joint checking account at the Morganfield National Bank. This account was separate from that in which petitioners deposited funds received from *106 the State of Indiana discussed below and was petitioners' basic household account. During 1979 and 1980, financial activity in this account remained relatively constant with approximately 120 checks being drawn on the account per month. Deposit activity during the years in issue also remained relatively constant at approximately five deposits per month. Petitioner occasionally saw patients privately in his home. This was usually the case with some of his more prominent clients who did not wish to be seen entering or leaving Dr. Reitman's offices. Petitioners billed these patients separately from the patients seen at Dr. Reitman's offices to avoid the 25 percent fee arrangement. Either petitioner would bill the patient or other financially responsible party on an ad hoc basis. In doing so petitioners maintained accurate records of the patients seen and amounts received with respect to these patients during 1979 and 1980. All income derived from petitioner's in-home consultations was properly reported on their 1979 and 1980 returns. Petitioner's practice with the State of Indiana involved work as a consultant and administering electro convulsive therapy (ECT) treatments. *107 Petitioner's primary responsibility as a consultant was to evaluate patients referred by other physicians who generally specialized in some sort of internal medicine. Depending on the patient's condition, petitioner might recommend ECT treatments, medication or some other course of treatment for the patient's psychological disorders. Petitioner generally consulted with patients and physicians on Wednesdays and Fridays at Deaconess Hospital. Petitioner's fee as a consultant was a flat fee of $ 500 per month. During 1979 and 1980, petitioner received $ 6,500 and $ 5,000, respectively, for services rendered as a consultant. These amounts were reported on Forms 1099 by the State of Indiana and on petitioners' respective tax returns for each year. Petitioner directed the State of Indiana to send these payments to his home to avoid the fee arrangement with Dr. Reitman. Petitioners did not deposit the checks for consulting fees earned; rather, these checks were cashed and used to pay household expenses. The bulk of petitioner's work for the State of Indiana involved administering ECT treatments at two state hospitals. Initially, patients were transported by the state from the *108 Evansville State Hospital to Deaconess Hospital where they would receive ECT treatments. Because of the potential danger involved in transporting patients between the hospitals, however, petitioner and the stage authorities began administering treatments at the Evansville State Hospital as well. [3]
ECT treatments are administered to profoundly depressed or psychotic patients and generally after resort to medication and other therapy has failed. Prior to administering the treatments petitioner would examine the patient to determine whether ECT treatments were warranted. If petitioner felt the patient would benefit from ECT treatments he had to determine whether unilateral or bilateral ECT treatments should be administered. Petitioner's recommendation that a patient undergo ECT therapy was always reviewed by a committee of physicians. Only if the committee approved petitioner's recommendation would *109 he administer ECT treatments. Treatments were generally performed early on Tuesday and Thursday mornings. After administering ECT treatments, petitioner would then go to Dr. Reitman's offices to resume his private practice. Petitioner performed 1,403 ECT treatments in 1979 and received fees for administering the treatments totaling $ 69,294 for that year. Petitioner performed 664 ECT treatments in 1980 and received fees for administering the treatments totaling $ 22,011 for that year. Petitioner did not report any of the fees for administering ECT treatments in 1979 on their joint return for that year. Petitioners reported only $ 990 of the fees received for administering ECT treatments in 1980 on their joint return for that year. The amounts received for administering ECT treatments were not reported by the State of Indiana on Forms 1099 for either year. Petitioners did not believe that the Form 1099 received with respect to Dr. Longstaff's consulting duties were intended to represent all of the income received from the State of Indiana. In order to receive payment for ECT treatments that petitioner administered, he was required to submit an itemized statement to the State *110 of Indiana stating the number of ECT treatments he performed on each patient. The statements were issued using petitioner's private stationery and petitioner's wife assisted in the preparation of the statements in both 1979 and 1980. Petitioners' daughter also assisted in the preparation of some of the statements during each of those years. Upon receipt of the statements furnished by petitioners, the State of Indiana issued a claim voucher for payment of ECT treatments performed during the preceding month. Petitioner was required to certify that the claim voucher correctly stated the amount owing, that the amount was legally due, and that no amount listed on the claim voucher had been previously paid. The State of Indiana issued a payment warrant in favor of petitioner only after receiving a signed claim voucher from petitioner. At petitioners' direction, the State of Indiana sent the ECT payment warrants to petitioners' home rather than to Dr. Reitman's offices. This was also done to avoid the fee arrangement with Dr. Reitman with respect to these amounts. All of the payment warrants were endorsed by petitioner in favor of his wife. Except for two, all of the ECT payment *111 warrants received by petitioners in 1979 and 1980 were deposited into one of petitioner's wife's checking accounts. Petitioner's wife was the sole owner of the account and petitioner did not have any signatory authority over the account. Upon petitioner's direction, however, ECT funds were transferred from his wife's account to other accounts over which petitioner had signatory authority and were disbursed by him for various investments. Petitioners maintained or had easy access to three types of records relating to the ECT treatments administered by petitioner during each of the years in issue. Upon his arrival at the state hospital where the ECT treatments were administered, petitioner received a list of patients scheduled to receive ECT treatments prepared by the hospital staff. Petitioner indicated on the patient treatment schedule the number of ECT treatments received by each patient on that particular day. Petitioners retained copies of the patient treatment schedules from which they computed, on a monthly basis, the amount owed to petitioner for administering the ECT treatments. Petitioners also maintained a system of index cards filed by patient name which listed the *112 number and dates of ECT treatments received by each patient. The index cards were maintained accurately through August of 1979; however, due to petitioner's wife's physical condition, discussed below, they were not accurately maintained after that date, although some entries were made. Petitioners also retained copies of the claim vouchers required to be signed in order to receive payment from the State of Indiana. From these records, petitioners compiled accurate itemized statements setting forth the number of ECT treatments administered each month which were submitted to the State of Indiana for billing purposes, also on a monthly basis. Both petitioners were subject to significant physical maladies during the years in issue. Mrs. Longstaff had an abdominal mass removed in October of 1978 and underwent post-operative chemotherapy. In November 1979, second-look exploratory surgery indicated that no residual cancer was present; however, her fatigued condition was aggravated by the surgery. In early January, 1980, Mrs. Longstaff had an episode of sciatica affecting her right sciatic nerve. At times, the sciatica impaired her ability to move about. The sciatica also made it *113 painful for her to sit for any length of time and may have impaired her concentration. The sciatica persisted through April, 1980, and was an intermittent problem through September, 1980. By September, 1980, the sciatica had substantially improved, although it was not completely cleared up. Petitioner is a paraplegic caused by polio in 1952. His adaptation to his paraplegia was considered unusually good by his physician. In June 1980, after petitioners' 1979 return had been filed, he was diagnosed as having severe two-vessel coronary artery disease and underwent a triple saphenous venous bypass graft. At or around the time of surgery he had a relatively small coronary. He was hospitalized from June 27 through July 15, 1980. Petitioner's post-operative recovery was slower and more difficult than usual because of his paraplegia. Dr Longstaff also required brief rehospitalization in August 1980 because of post pericardotomy pericarditis and chest pains of unknown origin. Shortly after his coronary bypass surgery petitioner experienced periods when he would become drowsy, sleepy and inattentive. These episodes were observed after petitioner performed long hours of ETC treatments, *114 during his periods of hospitalization, and in social situations. Petitioner was also preoccuppied, at times, with anxiety over his wife's health and well being because, due to his paraplegia, he was required to rely on her heavily both physically and emotionally. In June 1981, after petitioners' 1980 return had been filed, Dr. Longstaff was hospitalized for four days following an episode of weakness in the right arm, inability to speak, and weakness in the right facial muscles. Neither petitioner underwent any type of psychiatric care during the years in issue, nor was there any evidence of marital discord, drug or alcohol abuse, or other serious mental illness during those years. While, at times, both petitioners were understandably very concerned and anxious about the health and well-being of the other, and of themselves, each was mentally capable of controlling his or her conduct, and understood the distinction between right and wrong during each of the years in issue. Petitioner continued his assistant professorship which involved supervising residents in administering total patient care both in and out of the hospital and he testified in April, 1979 as an expert psychiatric *115 witness in a child custody hearing in Owensboro, Kentucky. During the years in issue petitioners also traveled to Florida twice and to Louisville, Kentucky, during the week of the Kentucky Derby. During 1979 and 1980, petitioners engaged in a significant amount of outside investment activity. Dr. Longstaff was a one-fourth partner in Crittendon Farms Partnership during both of the years at issue. The partnership business involved buying and selling real estate, including farms. Petitioners claimed and were allowed partnership losses of $ 46,848 and $ 54,693 during 1979 and 1980, respectively. Dr. Longstaff also had an ownership interest in Omer Farms, also in Crittendon, Kentucky. Petitioners reported farm income of $ 1,392 in 1979 and were allowed a loss of $ 44,197 in 1980 with respect to Dr. Longstaff's interest in Omer Farms. A portion of the losses claimed during each year was attributable to travel to and from the farms which was substantiated by petitioners by records they maintained and submitted to their accountants. Petitioners also engaged in three significant real estate transactions during the years in issue. In January 1979, petitioners took out a $ 630,000 *116 mortgage with the Equitable Life Assurance Society of the United States (Equitable) for a farm in Livingston, Kentucky. [4] Six months later, in June 1979, petitioners conveyed the farm to Crittenden Farms Partnership which assumed all obligations of petitioners under their mortgage with Equitable. In May 1979, petitioners took out two mortgages totaling $ 184,000, to purchase in their individual capacities another farm in Crittenden, Kentucky and in September 1980, petitioners sold for $ 850,000 a farm known as the Fleming Farm, also located in Livingston, Kentucky. This sale was subject to a right of way easement in favor of the United States which petitioners sold in April 1980. During the years in issue, petitioners, either individually or jointly maintained nine (9) checking accounts, one (1) savings account and one (1) investment *117 account. Total deposits into these accounts during each of the years in issue exceeded $ 400,000. Petitioners' accountant and tax return preparer was Clarence Fehn, C.P.A. [5] Mr. Fehn was a principal of the certified public accounting firm of Harding and Shymanski. In his prime Mr. Fehn would prepare returns by hand rather than by using any type of computerized tax return preparation service. Mr. Fehn was diagnosed as having cancer in the spring of 1980 at which time he underwent surgery. His health seriously deteriorated from the time until his death in January, 1981, which was prior to the preparation and filing of petitioners' 1980 return. Mr. Fehn prepared petitioners' 1978 return, probably by hand; however, because of his deteriorating health his involvement with the preparation and filing of petitioners' 1979 return was considerably less than it had been in the past. Although Mr. Fehn signed petitioners' 1979 return as tax preparer, numerous other people *118 employed by his firm were involved with the preparation and filing of this return, which was prepared using a computerized tax return preparation service. Both petitioners furnished information to Harding and Shymanski in connection with the preparation and filing of each return at issue. Either or both petitioners furnished, inter alia, information relating to travel expenses to view farm property, charitable contributions, contributions to their Keogh Plan, income received from the State of Indiana for consulting, net income received from Dr. Reitman, and gross income derived from petitioner's consultations with patients in his home. Neither petitioner furnished any information regarding income received from the State of Indiana for administering ECT treatments. In the course of furnishing information to Harding and Shymanski for the preparation of their 1979 return, Dr. Longstaff requested information from the People's Bank of Marion, Kentucky, regarding the amount of interest he paid on a loan during 1979. At some point during the years in issue petitioner also discussed the tax consequences of owning versus leasing an automobile. As a result of these discussions, petitioners *119 stopped leasing their automobile and purchased one outright. In preparing returns for its clients, Harding and Shymanski generally relied on its clients to provide all sources of income and deductions. Employees of the firm did not inquire as to the correctness or completeness of the information provided unless they suspected something out of the ordinary. No inquiries as to the correctness or completeness of the information provided by petitioners were made with respect to either of the years in issue. OPINION Section 6653(b) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of a joint return, section 6653(b) shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. Section 301.6653-1(f), Proced. and Admin. Regs. The addition to tax under section 6653(b) is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. *120 Helvering v. Mitchell,303 U.S. 391, 401 (1938). Respondent bears the burden of proving fraud by clear and convincing evidence. Rule 142(b); section 7454(a); Candela v. United States.635 F.2d 1272, 1273 (7th Cir. 1980); Drobny v. Commissioner,86 T.C. 1326, 1348-1349 (1986); Doncaster v. Commissioner,77 T.C. 334 (1981); Otsuki v. Commissioner,53 T.C. 96, 105 (1969); Acker v. Commissioner,26 T.C. 107, 111-112 (1956). Respondent need not prove the precise amount of the underpayment attributable to fraud; the addition to tax under section 6653(b) attaches to the underpayment even if only a portion of it is due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962). To establish fraud, respondent must introduce clear and convincing evidence that petitioners acted with specific intent to evade taxes known or believed to be owed. *121 Stephenson v. Commissioner,79 T.C. 995, 1005 (1982), affd. per curiam, 748 F.2d 331 (6th Cir. 1984). See also Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958). Fraud is a factual question to be resolved upon careful consideration and examination of the entire record. Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Stratton v. Commissioner,54 T.C. 255, 284 (1970), modified on other grounds 54 T.C. 1351 (1970). Fraud is never imputed or presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970), and the addition to tax should not be sustained upon facts which create only a mere suspicion of fraud. *122 Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). Because direct proof of specific fraudulent intent is seldom available, respondent may establish fraud by circumstantial evidence, Nicholas v. Commissioner,70 T.C. 1057, 1975 (1978), considering the taxpayer's entire course of conduct. Rowlee v. Commissioner, supra;Stone v. Commissioner,56 T.C. 213, 223-224 (1971), Otsuki v. Commissioner, supra at 105-106. Specifically, we must consider the taxpayer's conduct and other circumstances surrounding the preparation, signing, and filing of the allegedly fraudulent return. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968), affg. in relevant part a Memorandum Opinion of this Court. See also Wilson v. Commissioner,76 T.C. 623, 633 (1981), Supplemental Opinion 77 T.C. 324 (1981); Estate of Stein v. Commissioner,25 T.C. 940, 966-967 (1956), affd. per curiam 250 F.2d 798 (2d Cir. 1958). Where a claim of ignorance, inadvertence, or honest mistake is made, this Court must consider each taxpayer's intelligence, education, *123 and tax expertise in making its determination. Drobny v. Commissioner, supra;Iley v. Commissioner,19 T.C. 631, 635 (1952). Mere negligence, or even gross negligence, by or on behalf of the taxpayer will not alone sustain a finding of fraud. Candela v. United States, supra at 1276. Applying the foregoing criteria to the instant case we find that respondent has sustained his burden of proof with respect to both petitioners for 1979 and 1980. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence which may support a finding of fraud. Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984), affg. a Memorandum Opinion of this Court; Beaver v. Commissioner, supra at 93. Initially, petitioners have conceded that they failed to report ECT fees of $ 69,294 and $ 21,021 ($ 22,011 received less $ 990 reported) for 1979 and 1980, respectively. While a mere omission of reportable income is not of itself sufficient to warrant a finding of fraud, the repeated omission of reportable income is not a mere omission, *124 and an exceptionally large omission is not a mere omission. Lee v. United States,466 F.2d 11, 17 (5th Cir. 1972). Thus, the failure to report the ECT income may be considered as circumstantial evidence of fraud, particularly when, as here, the amount of omitted income was significant in amount and readily ascertainable from records in petitioners' possession. Virtually all of the omitted income was deposited into a single account which facilitated accurate recording and reporting of this income and also indicates a particular awareness on behalf of both petitioners of the existence of the ECT income earned during the years at issue. Nevertheless, all of the ECT income derived during 1979 and virtually all of that income derived in 1980 went unreported. Respondent also introduced clear and convincing evidence of petitioners' accurate bookkeeping system which may tend to prove or disprove the existence of fraud. See, e.g., Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied *125 397 U.S. 962 (1970). Petitioners maintained very complete and accurate records of all monies owed to them during the years in issue. Either petitioner faithfully billed each patient or other financially responsible party who consulted with Dr. Longstaff in petitioners' home during 1979 and 1980. Petitioners also kept meticulous records of the number and frequency of ECT treatments administered at the state hospitals by Dr. Longstaff during each of the years in issue. Although petitioners' index card system was not accurately maintained beyond August, 1979, petitioners had other records of the omitted ECT income at their disposal including patient treatment schedules which Dr. Longstaff brought home from the hospital whenever he administered ECT treatments, and claim vouchers from the State of Indiana, which he was required to certify prior to receiving payment. The fact that all income from Dr. Longstaff's home consultations was reported on petitioners' respective returns is not inconsistent with a finding that petitioners fraudulently underreported the income received for administering ECT treatments. In both cases petitioners were responsible for accounting *126 for, billing, and collecting fees and maintained accurate records to facilitate that end. That petitioners were aware of the existence and amount of the fees collected and the obligation to accurately report the income received for administering ECT treatments is clear; yet they failed to do so. Under these circumstances, petitioners' failure to report the income received for administering ECT treatments is strong evidence of fraud. Respondent also introduced clear and convincing evidence of petitioners' business experience, familiarity with the tax laws, and other investment activity all of which may tend to prove or disprove the existence of fraud. See O'Connor v. Commissioner,412 F.2d 304, 310 (2d Cir. 1969), affg. on this issue a Memorandum Opinion of this Court, cert. denied 397 U.S. 921 (1970). The record indicates that both petitioners possessed sufficient education, experience, and tax sophistication to understand the obligation to report all income received during the years in issue. Although petitioners claimed to be unsophisticated in tax matters and not astute business persons, their business conduct indicates otherwise. The record *127 indicates that both petitioners were concerned with and aware of their joint tax posture at all times during the years in issue. As early as December, 1979, Dr. Longstaff had begun gathering information regarding interest paid to a third party for preparation of petitioners' 1979 return. In April, 1980, several weeks prior to the filing of petitioners' 1979 return, Mrs. Longstaff telephoned petitioners' accounting firm to advise that $ 7,500 had been paid into petitioners' Keogh account. Also, during the years in issue, petitioner discussed with his accountant the tax consequences of owning rather than leasing an automobile; they maintained a travel log to substantiate expenses incurred to view investment property; and retained records of all charitable contributions made during the years in issue. Petitioners also engaged in numerous real estate transactions both individually and through partnerships. While these are not badges of fraud per se, see Spies v. United States,317 U.S. 492, 499 (1943), they do indicate that both petitioners were familiar with the preparation and contents of the returns at issue, a fact which further supports a finding that the *128 omission of the ECT income during both years at issue was due to fraud. Petitioners have attempted to negate respondent's evidence of fraud primarily by relying on the state of their health during the years in issue. Petitioners suggest that they were victims of an unfortunate set of circumstances and were mentally incapable of forming the specific intent necessary to support a finding of fraud. We disagree. The fact that the State of Indiana failed to issue a Form 1099 to reflect the amounts paid does not absolve petitioners of liability for failure to report that income. The requirement that taxpayers maintain accurate books and records for the computation of their income tax liability is separate and distinct from the requirement that a Form 1099 be sent to remind a taxpayer of income earned during the year. See section 301.6001-1, Proced. and Admin. Regs. Moreover, we have found as a fact that neither petitioner thought that the Form 1099 sent with respect to petitioners' consulting arrangement with the State of Indiana was intended to include amounts paid for administering ECT treatments. Even without receiving a Form 1099 with respect to the ECT income, petitioners *129 were fully aware of the amount of that income, but did not furnish any information regarding this income to their accountants or otherwise report it on either return at issue, other than a de minimis amount in 1980. Petitioners also suggest that the death of their accountant, Clarence Fehn, should absolve them of liability for fraud under section 6653(b). While taxpayer's reliance upon his or her accountant to prepare accurate returns may indicate an absence of fraudulent intent, this is true only if the accountant has been supplied with all of the information necessary to prepare the returns. Estate of Temple v. Commissioner,67 T.C. 143, 162 (1976). Here, petitioners' accountants were not supplied any information whatsoever regarding the omitted ECT income, despite the fact that both petitioners supplied information regarding other income and deductions that they were entitled to for each year in issue including, but not limited to, travel expenses, charitable contributions, and contributions to petitioners' Keogh account. Petitioners' withholding of information regarding the ECT income from their accountant is evidence of fraud, particularly when one considers *130 the amount of income involved and their attention to detail where deductions beneficial to them were involved. After observing first-hand petitioners' demeanor and considering their credibility at trial, which may tend to prove or disprove fraud, Toussaint v. Commissioner,743 F.2d 309, 312 (5th Cir. 1984), affg. a Memorandum Opinion of this Court, petitioners' argument that they were mentally incapable of formulating the specific intent necessary to sustain a finding of fraud under section 6653(b) can be likened to the proverbial old hound dog that just won't hunt. The Court acknowledges that during 1979 and 1980 both petitioners were afflicted by severe physical maladies and we genuinely commiserate with them in this regard. The Court also acknowledges that each petitioner was understandably concerned about the health and well-being of the other, which at times may have preoccupied their thoughts. Nevertheless, both petitioners were capable of forming the specific fraudulent intent necessary to sustain a finding of fraud and we so find. The cases relied on by petitioners to the contrary are easily distinguishable. Where we have found taxpayers to be mentally *131 incapable of fraudulent intent in the past, the taxpayers involved were found to be suffering from severe psychosis and paranoid schizophrenia, Hollman v. Commissioner,38 T.C. 251 (1962), heavy drinking and marital discord, [6] fear of religious persecution, [7] or taxpayers whose mental disorders were so severe that they required the very ECT treatments which petitioner at all times during the years in issue was competent to administer. [8] See Wilson v. Commissioner, supra.
Here, the record indicates that both petitioners were mentally quite capable during 1979 and 1980. Petitioners' mental condition during the years in issue did not even remotely approach the level of psychosis or trauma we have required to negate fraudulent intent in the past. At the most, petitioners' mental condition *132 may have "amount[ed] to something more than worry but something less than insanity." Spies v. United States, supra, at 493. They engaged in at least three significant real estate transactions during these years, both in terms of the dollar amount and complexity; they segregated funds derived from different sources of income and transferred funds among numerous accounts at different financial institutions; they also paid all household and other expenses, such as their mortgage and car payment, on a timely basis. The ability to handle one's financial affairs in such an intelligent and businesslike manner is inconsistent with the proposition that they did not have the capacity to commit fraud. Farber v. Commissioner,43 T.C. 407, 425 (1965); see also Conforte v. Commissioner,74 T.C. 1160, 1203 (1980), affd. on this issue 692 F.2d 587 (9th Cir. 1982). Additionally, there is no evidence of any marital discord between petitioners, nor is there any evidence of either alcohol or substance abuse by either petitioner during the years in issue. To the contrary, petitioners functioned quite well in society, they took vacations, *133 attended social functions, and adapted to their physical illnesses and those of their spouse quite well. Petitioner continued to see patients at the Reitman offices and at his home. There is no evidence in the record that Dr. Longstaff ever missed an appointment due to his or his wife's illness during the years in issue. Rather, the record indicates that Dr. Longstaff devoted more time and energy to his practice after his illness to insure that he maintained his high level of medical competency so that his patients would not suffer on account of his illnesses. Significantly, he continued to administer ECT treatments on a regular basis and in a competent fashion. In doing so he was required to exercise his skill and professional judgment to determine whether patients' symptoms would best respond to unilateral or bilateral treatment, was subject to committee review of his recommendations, and was responsible for supervising a team of professionals as the treatments were administered. He also continued his assistant professorship which involved supervising residents in psychiatry. Petitioners were also mentally capable enough to maintain accurate record of the patients who received *134 ECT treatments and to accurately bill the State of Indiana for administering those treatments. The only incapacity evidence by petitioners with respect to 1979 and 1980 was their failure to submit complete records relating to the ECT treatments which were admittedly in their possession to their accountants and their failure to otherwise return and pay tax on all of the income derived therefrom. Respondent's burden of proving fraud is admittedly a heavy one, but it is "not a millstone of impossible carriage." Lee v. United States, supra. As triers of fact this Court must discern a plot of fraudulent conduct; we need not, however reconstruct every line of the scenario. Lee v. United States, supra.The record in this case is pregnant with fraud. We have thoroughly considered each of petitioners' attempts to rebuke the clear and convincing evidence of fraud put forth by respondent and find them without merit. We simply do not believe that the failure to provide complete information to their accountants regarding the ECT income derived in 1979 and 1980 and their failure to otherwise return and pay tax on all of that income was anything other *135 than a specific fraudulent attempt to evade a tax which both petitioners knew to be owing. Respondent's determinations of the addition to tax under section 6653(b) is sustained for 1979 and 1980 with respect to both petitioners. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. All issues with respect to 1982 have been settled by the parties. Because we have sustained respondent's determination of the additions to tax under section 6653(b)↩ for 1979 and 1980, we need not address the parties' arguments regarding section 6501(e). 3. The record is not clear on this point; however, it appears that at some point petitioner and the state authorities discontinued administering ECT treatments at Deaconess Hospital. After that time, petitioner's only duties at Deaconess Hospital were consultative in nature. ↩
4. Presumably this mortgage was a purchase money mortgage, but the record does not so indicate. Also, although the mortgage instrument refers to an attached exhibit giving the legal description of the land, the exhibit is not in the record. The instrument does indicate, however, that the mortgaged land was situated in Livingston, Kentucky. ↩
5. Although petitioners characterize their relationship with Mr. Fehn as "longstanding" there is no evidence in the record that he assisted with the preparation of any of petitioners' returns prior to 1977. ↩
6. Paddock v. Commissioner,T.C. Memo. 1985-586; see also Wolk v. Commissioner,T.C. Memo. 1985-112↩ (violent arguments with spouse). 7. Klein v. Commissioner,T.C. Memo. 1984-392↩. 8. Simonelli v. Commissioner,T.C. Memo. 1985-12; see also Klein v. Commissioner, supra,↩ n. 10.