MICHAEL B. BROWN AND JUDITH M. BROWN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brown v. Commissioner
Docket No. 23602-87
United States Tax Court
T.C. Memo 1991-200; 1991 Tax Ct. Memo LEXIS 224; 61 T.C.M. (CCH) 2543; T.C.M. (RIA) 91200; May 13, 1991, Filed *224 Decision will be entered under Rule 155. R. Wayne Byrd, David G. Fawcett, and W. Duvall Spruill, for the petitioners. Charles P. Hanfman and Mark S. Mesler, for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in, and additions to, petitioners' Federal income tax as follows: Additions to Tax Year
Deficiency
Sec. 6653(b)
Sec. 6653(b)(1)
Sec. 6653(b)(2)
1978
$ 10,410
$ 5,205.00
--    --
1979
5,058
2,529.00
--    --
1980
6,147
3,073.50
--    --
1981
4,925
2,462.50
--    --
1982
3,157
--   $ 1,578.50
*
Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues before the Court are: (1) Whether petitioners had unreported taxable income each year, resulting in an underpayment *225 of tax each year; (2) Whether the underpayment of tax each year was due to fraud on the part of petitioner Judith M. Brown [1] within the meaning of section 6653(b); and (3) Whether assessment of the tax is barred by the three-year statute of limitations of section 6501(a) or whether the tax can be assessed "at any time" under the fraud exception of section 6501(c)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time of the filing of the petition in this case, petitioners Michael B. Brown and Judith M. Brown, husband and wife, resided in Sumter, South Carolina. Petitioners filed joint Federal income tax returns for the years 1978, 1979, 1980, 1981, and 1982. All references hereinafter to petitioner in the singular will be to petitioner Judith M. Brown and to petitioners in the plural will be to *226 both spouses. However, the witnesses referred to petitioner-husband as "Michael" or as "Bubba," his nickname, and to petitioner-wife as "Judy," and these designations will be used occasionally for convenience. During the years before the Court, Michael was employed as a school teacher. Judy was employed as a secretary and bookkeeper. In December of 1977, Michael and Judy purchased the old Clint Brogdon family home, a run-down southern mansion, and undertook to restore and improve it. They paid $ 24,700 for the house, paying down only 5 percent and obtaining a mortgage for 95 percent of the purchase price. Michael's mother, Mrs. Virginia Boykin, co-signed the note for that purchase. In connection with the purchase of the Clint Brogdon house in December of 1977, petitioners obtained a mortgage loan from First Federal Savings & Loan Association of Sumter, South Carolina. In securing that loan, petitioners filled out a financial statement, indicating a maximum cash of $ 1,400, composed of $ 300 cash in bank, $ 600 in savings and loan shares, and $ 500 earnest money deposited. That financial statement dated November 29, 1977, reflected all of the cash that petitioners had at that *227 time. Petitioners did not acquire any additional amounts of cash by December 31, 1977, and the amount of cash they had in banks declined slightly by the end of the year. [2]
In the period from 1978 through 1982, petitioners spent $ 80,263 for the following work and improvements to the Clint Brogdon house: Cabinets
$ 10,346
Iron fence
1,512
Iron gate
839
Iron benches
600
Gate opener
1,632
Bricks
8,574
Landscaping
7,636
Heat/Air conditioning
2,473
Floor coverings
2,483
Power pole
204
Concrete
3,111
Lumber
7,984
Lowes, Inc.
11,769
Carpenter
18,500
Painter
1,000
Cal Dor
1,600
The above expenditures were spread over this period as follow: 1978
$ 39,945
1979
19,239
1980
17,372
1981
447
1982
3,260
In 1979 petitioners also purchased furniture for the house *228 which cost $ 3,399. Also in 1979 petitioners purchased paintings for the house costing $ 1,000, and in 1980 purchased more paintings costing $ 670. In addition in 1981 petitioners installed a swimming pool on this property which cost $ 13,099. While restoring and improving the Clint Brogdon house, petitioner used an inactive Boykin Landscaping bank account to pay for some of the work. Michael's mother, Mrs. Virginia Boykin, signed the checks. Petitioner usually prepared the checks which Virginia Boykin signed. Also petitioner deposited the money into that Boykin Landscaping account to cover these checks. In 1978, checks in the total amount of $ 9,545.67 were written on that account for the restoration of and improvements to that house; in 1979, checks in the total amount of $ 15,711.50 were written on that account for that purpose. The total amount of $ 25,257.17 for both years represented funds supplied by petitioner and not gifts from Virginia Boykin. Petitioners had the following assets and liabilities as of December 31 of each year, as follows: Net Worth Schedule
1977
1978
1979
1980
Assets:
Cash in banks
1. S.C. Federal
Savings & Loan
$ 525.47 $ 380.22
$   321.45
$ 1,189.35
2. C & S National
Bank-checking
515.26 322.57
605.28
102.99
3. C & S National
Bank-savings
-0-   68.35
42.76
45.06
4. Bank of Clarendon
-0-   -0-  -0-  30.80
5. Citizens
Bank-checking
(4.37)
411.28
339.06
219.64
6. Citizens-savings
104.62 594.23
1,596.81
68.84
7. Citizens
Bank-CDs
-0-   -0-  -0-  1,000.00
*229 1981
1982
Assets:
Cash in banks
1. S.C. Federal
Savings & Loan
$   752.38 $ 1,186.88 2. C & S National
Bank-checking
285.30 335.28 3. C & S National
Bank-savings
47.49 37.73 4. Bank of Clarendon
28.73 28.73 5. Citizens
Bank-checking
(104.90)
(83.83)
6. Citizens-savings
(47.40)
83.94 7. Citizens
Bank-CDs
2,000.00 4,000.00 1977
1978
1979
1980
Automobiles
1972 Chevrolet
$  5,000.00
$   5,000.00
$   5,000.00 $   5,000.00
1977 Oldsmobile
6,786.00
6,786.00
-0-   -0-  1972 Corvette
9,495.00
9,495.00
9,495.00
9,495.00
1980 Thunderbird
-0-  -0-  7,975.00
7,975.00
1971 Ford Pickup
-0-  -0-  1,450.00
-0-  American Mobile
Home
2,500.00
-0-  -0-   -0-  Lot, Route 301
Gable, S.C.
5.00
-0-  -0-   -0-  John Deere Lawn
Tractor
-0-  -0-  -0-   1,612.00
John Deere Cart
-0-  -0-  -0-   -0-  Jewelry and
diamond pendant
10,950.00
10,950.00
10,950.00 10,950.00
House & lot -
Surfside Beach
37,125.00
37,125.00
37,125.00 37,125.00
House & lot - Sumter County
(Clint Brogdon
house)
24,700.00
24,700.00
24,700.00 24,700.00
Improvements to
Clint Brogdon
house (Cumulative)
-0-  39,945.00
59,184.00 76,556.00
Swimming Pool
-0-  -0-  -0- -0-  Furniture
-0-  -0-  3,399.00 3,399.00
Paintings
-0-
-0-  1,000.00 1,670.00
S/N Adjustment
-0-  -0-  (3,995.00)
-0-  Total Assets
$ 97,701.98
$ 135,777.65
$ 159,188.36 $ 181,138.68
*230 1981
1982
Automobiles
1972 Chevrolet
-0-  -0-  1977 Oldsmobile
-0-  -0-  1972 Corvette
9,495.00
9,495.00
1980 Thunderbird
7,975.00
7,975.00
1971 Ford Pickup
-0-  -0-  American Mobile
Home
-0-  -0-  Lot, Route 301
Gable, S.C.
-0-  -0-  John Deere Lawn
Tractor
1,612.00
1,612.00
John Deere Cart
237.12
237.12
Jewelry and
diamond pendant
10,950.00
10,950.00
House & lot -
Surfside Beach
37,125.00
37,125.00
House & lot - Sumter County
(Clint Brogdon
house)
24,700.00
24,700.00
Improvements to
Clint Brogdon
house (Cumulative)
77,003.00
80,263.00
Swimming Pool
13,099.00
13,099.00
Furniture
3,399.00
3,399.00
Paintings
1,670.00
1,670.00
S/N Adjustment
-0-  -0-  Total Assets
$ 190,226.72
$ 196,113.85
1977
1978
1979
1980
Liabilities:
First Federal-
Savings Bank
$ 23,400.00
$ 22,330.43
$ 21,703.16
$ 21,157.62
C & S National
Bank
7,975.14
6,207.34
4,164.27
-0-   Bank of
Clarendon
-0-   -0-   -0-   8,556.27
Ford Motor
Credit Corp.
-0-   -0-   7,975.00
-0-   Citizens Bank
9,799.15
5,000.00
3,000.00
5,000.00
Total
Liabilities
$ 41,174.29
$ 33,537.77
$ 36,842.43
$ 34,713.89
*231 1981
1982
Liabilities:
First Federal-
Savings Bank
$ 20,420.72
$ 18,866.20
C & S National
Bank
-0-   -0-   Bank of
Clarendon
6,837.27
4,587.32
Ford Motor
Credit Corp.
-0-   -0-   Citizens Bank
5,000.00
4,250.00
Total
Liabilities
$ 32,257.99
$ 27,703.52
Petitioners had little or no cash on hand on December 31, 1977. In the deficiency notice respondent determined that petitioner had cash on hand of $ 200 on December 31, 1979, $ 274.80 on December 31, 1981, and $ 1,040 on December 31, 1982. There is no credible or persuasive evidence of any additional amounts of cash on hand (as opposed to cash in banks) on December 31 of those years or any other taxable years from 1977 through 1982. Petitioners' net worth increased each year as indicated below:
1977
1978
1979
1980
Cash on hand
$    -0-   $    -0-    $     200.00
$    -0-    Total assets
listed above
97,701.98
135,777.65
159,188.36
181,138.68
Totals:
$ 97,701.98
$ 135,777.65
$ 159,388.36
$ 181,138.68
Less total
liabilities
41,174.29
33,537.77
36,842.43
34,713.89
Net worth
$ 56,527.69
$ 102,239.88
$ 122,545.93
$ 146,424.79
Less net worth
of preceding
year
56,527.69
102,239.88
122,545.93
Increase in net
worth
$  45,712.19
$  20,306.05
$  23,878.86
*232 1981
1982
Cash on hand
$     274.80
$   1,040.00
Total assets
listed above
190,226.72
196,113.85
Totals:
$ 190,501.52
$ 197,153.85
Less total
liabilities
32,257.99
27,703.52
Net worth
$ 158,243.53
$ 169,450.33
Less net worth
of preceding
year
146,424.79
158,243.53
Increase in net
worth
$  11,818.74
$  11,206.80
During 1978 petitioners reinvested the $ 7,495 from the sale of their former trailer home into their new home (the Clint Brogdon house) which amount would be nontaxable (tax deferred) under section 1034. During 1979 petitioners sold their 1977 Oldsmobile and had a nondeductible capital loss of $ 4,786. In 1981 petitioners made a gift of their 1972 Chevrolet (having a cost basis of $ 5,000) to Christine McFaddin, Judy's mother. For the reasons which will be discussed in the opinion below, the Court finds that during the years 1978 through 1982 petitioners received the following gifts. They received nontaxable gifts of cash from Christine McFaddin of no more than $ 1,000 each year and from Virginia Boykin of no more than $ 1,000 each year. In 1979 Judy received a gift of a 1980 Thunderbird automobile having a cost basis of $ 7,975. *233 In 1980 and 1981 petitioners received nontaxable gifts of cash from Eleda McFaddin, Judy's stepgrandmother, of $ 2,500 and $ 2,000, respectively. Any other nontaxable gifts of cash from Eleda McFaddin or any other relatives, friends, or acquaintances were nominal in amount and did not exceed a cumulative total of $ 500 in any year before the Court. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). The parties have stipulated that petitioners had personal living expenses in each of the years including at least the following items and amounts: PERSONAL EXPENDITURES
Item
1978
1979
1980
Itemized deductions
$  7,159.00 $  5,542.00
$  6,829.00 Medical
469.00 566.00
572.00 Fed. income taxes
withheld
2,285.20 2,256.00
2,446.00 FICA taxes (Judy)
407.94 541.69
493.47 FICA taxes (Michael)
512.08 581.44
640.00 Adjustment
(1,531.20)
--   --   Personal items -
Citizens Bank
checking acct.
--    1,801.10
2,622.23 Personal items -
C & S checking
acct.
--    507.58
864.25 Hand painted items
--    800.00
--    Payments to Judy's
mother
--    500.00
285.00 Sales tax
--    --   (210.00)
Belks, Inc.
--    --   937.03 Upholstery
--    --   --    Madam Alexander doll
--    --   --    Totals:
$  9,302.02 $ 13,095.81
$ 15,478.98 *234 Item
1981
1982
Itemized deductions
$  9,057.00 $  8,546.00 Medical
654.00 696.00 Fed. income taxes
withheld
3,012.00 2,875.00 FICA taxes (Judy)
613.46 618.09 FICA taxes (Michael)
799.68 913.37 Adjustment
--    --    Personal items -
Citizens Bank
checking acct.
2,386.28 2,379.14 Personal items -
C & S checking
acct.
1,489.49 1,491.15 Hand painted items
--    --    Payments to Judy's
mother
--    --    Sales tax
(219.00)
(230.00)
Belks, Inc.
1,228.00 951.45 Upholstery
200.00 --    Madam Alexander doll
--    150.00 Totals:
$ 19,220.91 $ 18,390.20 Respondent contends there are additional personal living expenses. The Court finds there are additional personal expenses each year in unspecified amounts for food, clothing, gasoline and oil, and miscellaneous. [3] Those additional personal living expenses amounted to at least $ 1,000 a year. During the years 1978 through 1982, petitioners made many purchases with cash. *235 During all relevant times before the Court, petitioner worked as a secretary and bookkeeper for Smith Grading and Paving Company, Inc. She and one Robert J. Osborne, Jr. (hereinafter Osborne) handled the office work. Osborne was a vice president and general manager, but his principal work was in the field, bidding on jobs and scheduling work. However, Osborne was authorized to sign and did sign some corporate checks. In fact he wrote checks for his travel reimbursement for his work in the field. Petitioner was authorized to sign checks on the corporate bank account, and she handled most of the company's banking transactions. She was in charge of payroll and paying bills for the corporation. She was the only person who reviewed and reconciled the corporate bank statements. Charles Dorn Smith, Jr. (hereinafter Smith), the principal stockholder of Smith Grading and Paving Company, Inc., did not closely supervise the company's office operations and did not seem to know what was going on in his business. During the latter part of this period, 1980 and thereafter, Smith Grading and Paving was involved in a criminal investigation for bid rigging on state highway projects. The *236 corporation ultimately pleaded guilty and was disqualified from bidding until restitution was made to the state. Smith was either distracted by these matters or simply negligent and indifferent to corporate business, or both. Petitioner received a salary of $ 150 a week, but she regularly wrote checks to herself to reimburse her alleged expenses for the company. While other employees were occasionally reimbursed small amounts of $ 25 or $ 50, petitioner paid herself rather substantial amounts as reimbursement. Other than trips to the local bank, petitioner did not incur travel expenses in her work for the corporation. From October 1979 through 1982, she wrote "reimbursement checks" for herself in the following total amounts: 1979
5 checks totaling
$ 1,100.00 1980
16 checks totaling
4,064.39 1981
14 checks totaling
3,757.90 *
1982
18 checks totaling
4,425.00 Smith did not authorize petitioner to make these *237 payments to herself and at the time was unaware that she was doing so. At some point, Smith Grading and Paving had an accountant audit its corporate books and records, such an audit being required by its bonding company. The auditor checked the books and records for the corporation's fiscal year ending July 31, 1979 (i.e., August 1, 1978 through July 31, 1979). That audit disclosed that checks in the total amount of $ 103,441.88 had been written, signed, and endorsed by petitioner and that no backup or documentation existed for these checks. Those checks were cashed by petitioner. Ultimately, Smith had that amount charged to his officer loan account (i.e. reduced by $ 103,441.88 the debt the corporation already owed to him). While Smith in fact received some of that $ 103,441.88, he did not receive all of that money. He believed petitioner had embezzled the funds, but he took no action against her to terminate her employment, to recover the funds, or to maintain adequate internal controls over corporate funds in the future. The auditor had recommended certain internal corporate controls such as separating the check writing function from the check signing function. While Smith *238 initially made some efforts to institute some changes, he rather quickly and negligently fell back into the same old practices. As indicated above, Smith had his own problems with the bid-rigging criminal investigation, and he was also reluctant to take any action against petitioner who was a relative by marriage. Petitioner remained as the corporate bookkeeper until April of 1983, when some further irregularities that she either could not or would not explain led to the termination of her employment with Smith Grading and Paving. During the years before the Court petitioner also wrote certain corporate checks which she endorsed and cashed for customers. However, she also wrote, endorsed, and cashed some checks for which the payees did not receive the funds as follows: 14
1979 Smith Grading and Paving checks
payable to English Trucking Co., totaling
$ 13,960
15
1979 Smith Grading and Paving checks
payable to Charles McElveen, totaling
9,763
18
1979 Smith Grading and Paving checks
payable to Jo Burgess, totaling
11,141
4
1982 Smith Grading and Paving checks
payable to Wardie and E. B. Mims,
totaling
1,890
During the years before the Court, petitioners reported *239 on their joint Federal income tax returns the following total income (or adjusted gross income, if different) and taxable income: Total Income (Adjusted      Year
Gross Income if Different)
Taxable Income
1978
$ 15,623
$ 11,664
1979
18,854
16,712
1980
19,066
15,637
1981
21,794
14,137
1982
23,680  (23,204)
16,058
ULTIMATE FINDINGS OF FACT 1. Petitioners had little or no cash on hand on December 31, 1977. 2. Petitioners did not receive gifts of cash in any substantial amount during any of the years 1978 through 1982. 3. The increases in petitioners' net worth each year were substantial and largely represented unreported taxable income each year. 4. Petitioners underpaid their taxes in each of the years 1978 through 1982. 5. The underpayment of tax in each of the years 1978 through 1982 was due to fraud on the part of petitioner Judith M. Brown. OPINION This is a fraud case involving the net worth plus expenditures method of determining unreported income. Over the five-year period 1978 through 1982, petitioners' net worth increased each year by the following amounts (rounded): $ 45,000, $ 20,000, $23,000, $ 11,000, and $ 11,000. Most of the *240 increased net worth represented the restoration of and improvements to an old run-down southern mansion in Sumter, South Carolina, the Clint Brogdon family home. Over the five-year period petitioners spent $ 98,431 restoring, improving, and furnishing that house, which amount is just $ 586 less than the total amount of gross income they reported for that period ( $ 99,017). I Unreported Income
To prove that petitioners understated the taxable income and underpaid the taxes required to be shown on their returns, respondent relies on the net worth plus expenditures method. That method is an acceptable mechanism for testing the accuracy of a taxpayer's tax returns, but its use requires the exercise of "great care and restraint." Holland v. United States, 348 U.S. 121, 129, 99 L. Ed. 150, 75 S. Ct. 127 (1954). The net worth plus expenditures method is not an accounting system but rather, when properly applied, is evidence of income. Holland v. United States, supra at 131, 138; Lipsitz v. Commissioner, 21 T.C. 917, 931 (1954), affd. 220 F.2d 871 (4th Cir. 1955). In a case such as this, where both the determination of unreported *241 income and the proof of fraud necessary to lift the bar of the statute of limitations depend upon respondent's net worth computations, the Court must examine the validity of respondent's computations under the standards laid down by the Supreme Court in Holland v. United States, supra, and United States v. Massei, 355 U.S. 595, 2 L. Ed. 2d 517, 78 S. Ct. 495 (1958). There are two prongs to those standards. First, respondent must establish "with reasonable certainty" an opening net worth to serve as a starting point. Holland v. United States, supra at 132. The second prong is in the alternative. Respondent must establish either that a likely source of the unreported income existed or that he has conducted a reasonable investigation of leads to negate the existence of nontaxable sources of income. Holland v. United States, supra at 137-138. Here there is little dispute between the parties as to the increases in petitioners' net worth each year. Basically all of the figures in the net worth computations have been stipulated by the parties. However, petitioners say the net worth computations err in two significant respects: *242 (1) the opening net worth for December 31, 1977, which they say fails to reflect cash on hand, and, (2) nontaxable income from gifts of cash each year. Thus, in both respects, petitioners rely on unspecified amounts of cash which they say they had on hand on December 31, 1977, or unspecified amounts of cash which they say they received as gifts from family members each year. Since all of these amounts are undocumented, except for two checks from the stepgrandmother, the testimony and the credibility of witnesses are crucial in this case. We will review that testimony in depth to show the basis for our findings of fact as to cash on hand and gifts of cash. Petitioner Michael B. Brown did not testify at all; petitioner Judith M. Brown testified in vague generalities about these alleged cash gifts and cash on hand. There is no proof of any cash on hand on December 31, 1977. Petitioners' financial statement in November of 1977 did not list any cash on hand, and Judy testified that if she had any cash when she signed a financial statement she would have included it. The Court concludes that petitioners had little or no cash on hand on December 31, 1977, and that respondent has established *243 the opening net worth with reasonable certainty. As to the second prong of the Holland-Massei standards, respondent conducted a reasonable investigation of all leads to negate the existence of sources of nontaxable income. The only leads and sources of nontaxable income suggested by petitioners during the criminal tax investigation and audit and during this litigation were the alleged gifts of cash from various family members. Michael allegedly received cash from his late grandfather, William Chandler Brogdon. Mr. Brogdon died March 11, 1985, at the age of 93. He had been ill for three or four years before his death. During his illness Judy and Michael performed a lot of personal care and household chores for him. A few months before his death, in December of 1984, Mr. Brogdon signed an affidavit detailing certain alleged gifts of cash to Michael. That affidavit was obtained by petitioners or their counsel in the course of the criminal tax investigation. The Court refused to admit that affidavit into evidence because there were no "equivalent circumstantial guarantees of trustworthiness" within the meaning of Federal Rule of Evidence 804(b)(5), and in fact there was much *244 to suggest its lack of trustworthiness. [4] There is no competent or credible evidence to establish the existence of these alleged gifts. Petitioner testified that Mr. Brogdon "helped us a lot financially," that the gifts of cash were "basically made to Bubba," and that Mr. Brogdon gave Bubba "cash at different times." *245 Michael failed to testify. He is the only person with personal knowledge of what transpired between him and his grandfather, and particularly as to certain specific sums of money that were allegedly given to him at certain times. Michael's failure to testify might well warrant an adverse inference that his testimony would not have supported his wife's vague testimony or the story detailed in the proffered Brogdon affidavit. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). In any event, there simply is no credible evidence in the record to show any gifts from Michael's grandfather. Also Michael's mother, Mrs. Virginia (Brogdon Brown) Boykin testified that her father, William Chandler Brogdon, tended to hold onto his money more tightly as he got older. Petitioner also testified that her father, Newell C. McFaddin, Jr., "has given us cash at different times in different amounts." Newell McFaddin is also deceased, and the Court also refused to receive his affidavit into evidence. That affidavit is unreliable. See supra note 4. Petitioner's mother, Christine McFaddin, testified *246 that her husband was disabled and an alcoholic and that she had to hide her little bit of money from him. The Court is satisfied that any gifts from petitioner's father were nominal at best. Virginia Boykin signed an affidavit, dated July 11, 1985, in which she stated that she made cash gifts to petitioners and had given them "as much as $ 1,500 in currency at one time and as much as $ 4,000 currency in one year." At trial she could remember nothing about that affidavit, except she agreed she had signed it. She testified that "I gave them a little money at different times, but not any large sums. I didn't have it to give." She had no money of her own when she married Mr. Boykin in 1968. The landscaping business the Boykins tried to run was not successful. The antique store and grocery store that they then opened did not make much money. Virginia Boykin candidly testified there "wasn't that much profit flowing there [antique store and grocery store]." She agreed that she had not given petitioners over $ 1,000 in any one year. Even more telling, however, was the difference between Virginia Boykin's live testimony and the statement in her affidavit that Attached hereto as *247 Exhibit B is a list of checks written to or for the benefit of Michael and Judy Brown for the years 1978 and 1979
Exhibit B listed checks written on an inactive Boykin Landscaping bank account, totaling $ 25,257.17 for the years 1978 and 1979. The affidavit creates the impression that Virginia Boykin gave that $ 25,257.17 to petitioners. However, at the trial, her testimony made it clear that while she signed those checks, it was petitioner herself who provided the funds and deposited the money into the Boykin Landscaping checking account to cover the checks. Those checks were used to pay for some of the restoration work on the Clint Brogdon house. In her own testimony, petitioner insisted that Virginia Boykin had given her and Michael "the majority of the money at one time or another." Virginia Boykin denied that she had given Michael and Judy the money that was put into that Boykin Landscaping bank account. The Court simply did not believe petitioner's testimony. The Court believed Virginia Boykin's testimony that she did not have that kind of money to give. The Court is satisfied that Virginia Boykin was not the source of the $ 25,000 plus that petitioner deposited *248 into that Boykin Landscaping bank account and used for restoration and improvement of the old Clint Brogdon family home. The statement in the affidavit that tried to create the impression that Virginia Boykin furnished that money was erroneous and egregiously misleading. Petitioner herself was the source of the misinformation that was incorporated into that affidavit. See supra note 4. Petitioner did not tell her attorney that she had provided the funds to cover those checks. At most Virginia Boykin made gifts of cash to petitioners of $ 1,000 each year. Again petitioner testified that her mother, Christine McFaddin, "has given us cash at different times." However, her mother's testimony shows that the amount was nominal. Christine McFaddin testified "several times I had given Judy -- two or three times, it was a good bit -- well, I mean for me, I thought." One time she gave her daughter "about a thousand" and another time $ 2,000, but she conceded it would not have been as much as $ 5,000 in the period 1978 through 1982. She agreed that at most it amounted to $ 3,000 to $ 4,000 for the five-year period. To Christine McFaddin, $ 600 to $ 1,000 to $ 2,000 was "big" money, *249 and she never had more than $ 2,500 available to her in any six-month period. Her husband, Newell McFaddin, was disabled. When her sister, Nell, was traveling, Christine McFaddin would take her disabled husband to Nell's home and do housecleaning for Nell's husband. Nell's husband, a doctor, gave Christine McFaddin some money from time to time for the housework and as gifts. The Court is satisfied that any such payments or gifts from the doctor to Christine McFaddin were not substantial and were needed for her and her disabled husband. Christine McFaddin candidly testified about hiding her money in the freezer, in the oven, and in her shoe bags because her husband was an alcoholic. While Christine McFaddin no doubt gave her daughter some small sums of money from time to time, it was clear that the amounts were nominal and that neither petitioner's mother nor father was in a position to give any substantial amounts of cash to petitioner and her husband. The parties have stipulated that Christine McFaddin made gifts of cash to petitioners of $ 1,000 each year. Petitioners contend the amount was more. The Court accepts the parties' stipulation, but thinks that, if anything, *250 the amount was probably less rather than more. Again petitioner testified that her stepgrandmother, Eleda McFaddin, had "given us a lot of cash." Eleda McFaddin testified to gifts of cash she made "from the savings my husband had left to me." Her husband, petitioner's grandfather, had been a mail carrier and also had engaged in small businesses on the side with rental properties and timberland. From these business activities he allegedly accumulated some cash, mostly in $ 100 dollar bills, that he, and later Eleda McFaddin herself, allegedly kept in "an old trunk" in their home. He allegedly left the money to Eleda McFaddin to give to his three granddaughters, i.e., to petitioner and her two older sisters, Becky and Kay. Eleda McFaddin testified she had done that over the years. She gave money to one granddaughter who had children attending private schools. Eleda McFaddin clearly remembered giving $ 3,000 to the other granddaughter and her husband in 1973 when they started a business. She was vague as to money given to petitioners other than a check to Judy for $ 2,500 dated November 4, 1980, and another check for $ 2,000 to Judy dated October 16, 1981, which Judy had marked *251 on the check as a loan, but which Judy had not repaid. There were some other checks signed by Eleda McFaddin in years subsequent to those before the Court, apparently paying Judy some sums of money owed to her by her sisters. However, Eleda McFaddin's testimony as to gifts of cash to Judy and her husband during the pertinent years was vague and unpersuasive. The Court observed that Eleda McFaddin was obviously very fond of petitioner and obviously wanted to help her in this tax case. Upon questioning by the Court, Eleda McFaddin conceded that the total amount of money left to her by her late husband did not exceed $ 50,000. Moreover, he had died in 1960, some 18 years before the earliest year before the Court. This story of an 18-year-old "cash hoard" in an old trunk came to light for the first time near the end of the trial of this case. If such a cash hoard ever existed at all, the Court simply does not believe that any substantial amount of it remained by 1978 and 1979, when Eleda McFaddin allegedly made gifts to help petitioners restore the old Clint Brogdon home. The Court concludes that any gifts of cash during the relevant time period were few and in small sums. Petitioner *252 also testified that William Clifton Brown, her husband's brother, "helped us a great deal financially" and had "given us a lot of cash money." Although William Clifton Brown was listed as a prospective witness on petitioners' Trial Memorandum, he was not called to testify at the trial. Petitioner also testified that Charles Dorn Smith, Jr., the owner of the corporation she worked for, gave her "cash money at different times." Smith testified at the trial but he was not questioned about these alleged cash gifts. As will be discussed below, petitioner did obtain large amounts of money from the corporation but the Court is satisfied that these were diverted funds and not "gifts." In October of 1979 Smith did buy petitioner a 1980 Thunderbird automobile and have his corporation pay for it. Since petitioner was being paid only $ 150 a week for her work as a secretary and bookkeeper, the car would seem to be compensatory rather than a gift flowing from detached and disinterested generosity. Commissioner v. Duberstein, 363 U.S. 278, 285, 4 L. Ed. 2d 1218, 80 S. Ct. 1190 (1960). That is particularly true since Smith had the corporation buy her a car at a time when the corporation did not have enough *253 money to pay all of its creditors. Smith told her that when any money came in to the company, she should double up on the payments to get the car paid for as soon as possible. An employer might well favor paying its employees over paying other creditors, but surely would not be making gifts when its creditors could not be paid. However, on brief, respondent has conceded that the money for the Thunderbird was a "nontaxable source," presumably a gift, and the Court accepts, although somewhat doubtfully, respondent's concession. Considering all of the testimony from the various witnesses and the record as a whole, the Court is satisfied there was little or no cash on hand on December 31, 1977, and that any gifts of cash during the years 1978 through 1982 were rather nominal in amount and cannot begin to explain the large increases in net worth each year. As to the alternative branch of the second prong of the Holland-Massei standards, which respondent need not establish, respondent has nonetheless established a likely source of the unreported income, namely, the funds petitioner diverted from her employer, Smith Grading and Paving Company, Inc. Those diverted funds included *254 both the unauthorized "reimbursement checks" she wrote for herself and some of the other checks she wrote, endorsed, and cashed, the proceeds of which never got into the hands of the payees or could never be accounted for. In conclusion, respondent has clearly and convincingly established through the net worth plus expenditures method that petitioners had substantial amounts of unreported taxable income and underpaid their Federal income tax in each of the years before the Court. [5]
II Fraud Additions
The next issue is whether or not the underpayment of tax each year was due to fraud on the part of petitioner Judith M. Brown within the meaning of section 6653(b). Respondent must of course prove fraud by clear and convincing evidence. Sec. 7454; Rule 142(b); *255 Stone v. Commissioner, 56 T.C. 213, 220 (1971). The fraud envisioned by section 6653(b) is actual, intentional wrongdoing and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States, 635 F.2d 1272, 1275 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020, 21 L. Ed. 2d 565, 89 S. Ct. 627 (1969); Mitchell v. Commissioner, 118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner, 76 T.C. 623, 634 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Stoltzfus v. United States, supra; Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner, 26 T.C. 107, 112 (1956). Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner, 328 F.2d 147, 151 (7th Cir. 1964), *256 cert. denied 379 U.S. 827, 13 L. Ed. 2d 37, 85 S. Ct. 55 (1964), cert. denied 389 U.S. 912, 19 L. Ed. 2d 259, 88 S. Ct. 234 (1967), affg. 37 T.C. 703 (1962); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered; fraudulent intent can, and usually must, be established by circumstantial evidence. Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943); Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. on the fraud issue a Memorandum Opinion of this Court; Gajewski v. Commissioner, 67 T.C. at 200; Stone v. Commissioner, 56 T.C. at 223-224; Otsuki v. Commissioner, 53 T.C. at 106. For all the reasons given in Part I of this Opinion, which are incorporated herein by reference, the Court is satisfied that respondent has proved by clear and convincing evidence an understatement of income *257 and an underpayment of tax each year. We turn next to the matter of fraudulent intent. While mere understatement of income, standing alone, is not sufficient to prove fraud, a pattern of consistent and substantial understatement of income is, by itself, strong evidence of fraud. Holland v. United States, 348 U.S. at 139; Foster v. Commissioner, 391 F.2d at 733; Cefalu v. Commissioner, 276 F.2d 122, 129 (5th Cir. 1960); Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Here there is a pattern of consistent understatement of income over a five-year period. That is strong evidence of fraud. Moreover, petitioner made many purchases with cash, a factor to be considered in fraud cases. Gromacki v. Commissioner, 361 F.2d 727, 731 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Meier v. Commissioner, 91 T.C. 273, 298 (1988). Moreover, petitioner paid by cash despite the fact that she had numerous bank accounts, both checking and savings accounts, in which she kept small sums of *258 money. More telling is that when petitioner paid workmen and suppliers for the restoration and remodeling work on the Clint Brogdon house by means of checks, she ran the funds and payments through an inactive Boykin Landscaping bank account and had Virginia Boykin sign the checks. The funds for these checks totaling over $ 25,000 were furnished by petitioner herself and deposited by her into the Boykin Landscaping bank account to cover the checks. During the criminal tax investigation, petitioner either prepared or caused her attorney to prepare a grossly misleading affidavit which Virginia Boykin signed. See supra note 4. That affidavit created the erroneous and egregiously misleading impression that Virginia Boykin gave the $ 25,000 to petitioner and her husband. Even at the trial when Virginia Boykin essentially repudiated the affidavit and agreed that she never gave them more than $ 1,000 in any one year, petitioner still insisted that Virginia Boykin had furnished that money "at one time or another." The Court simply did not believe her. The Court believed Virginia Boykin's testimony that she did not have that kind of money to give. Petitioner's failure to cooperate *259 during the investigation and audit of her tax returns is another factor for the Court to consider in determining fraudulent intent. Millikin v. Commissioner, 298 F.2d 830, 836 (4th Cir. 1962); Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Estate of Beck v. Commissioner, 56 T.C. 297, 365 (1971). The Court is mindful that petitioner was clearly entitled to claim her Fifth Amendment rights under the United States Constitution during the criminal phase of the case. However, the right to remain silent and not to incriminate oneself does not extend to furnishing misleading information such as found its way into the Virginia Boykin affidavit. There is the further matter of the false-invoices incident during the investigation and audit of petitioner's tax returns. Since it is not clear whether petitioner or her friend and business acquaintance, Barbara Brunson, was the person who conceived and initiated the idea of the false invoices, the Court has not accorded great weight to the matter. However, because of the time devoted to the incident at trial and on brief, the Court will discuss it. In the course of restoring *260 the old Clint Brogdon mansion, petitioners had purchased trees and shrubs from Brunson Nursery. These particular trees and shrubs had been purchased in 1980 and had been paid for in some instances by checks and in some instances by cash. However, Barbara Brunson had not reported the cash receipts on her tax return. When the Internal Revenue Service special agent wanted to examine the Brunson Nursery invoices as to petitioners' purchases, Barbara Brunson became rather panicky. She asked Judy to make a diagram of all the trees and shrubs in her yard and to bring that diagram and her (Judy's) copies of the Brunson Nursery invoices over to Barbara Brunson's house. Judy did that and Barbara proceeded to make up phony invoices to make it appear that the purchases by check covered all of the trees and shrubs purchased by petitioners. She accomplished that by reducing the prices so that the quantities purchases were all accounted for by the payments by check. She indicated at the trial that she did that to try to help petitioners with their tax problems. However, when the special agent came to see her, Barbara decided against lying to him and told him the false invoices were false. *261 She filed an amended tax return and paid the tax she owed. This false-invoices incident reflects badly on the credibility of both Barbara Brunson and petitioner. If Barbara did this to try to help petitioner by showing fewer expenditures on the Clint Brogdon house, which would be helpful in a net worth case, petitioner went along with the scheme. If Barbara did this because she admittedly had failed to report the cash receipts, petitioner was still a willing participant in the short-lived scheme to help her get away with it. Whichever scenario is correct, it demonstrates that petitioner went along with the preparation of false invoices, either to help her own tax case or that of her friend. While not entitled to great weight, this is a factor to consider, along with all of the other evidence in the record. Based on the record as a whole, the Court concludes that respondent has proved fraud on the part of petitioner by clear and convincing evidence. The elements of fraud under section 6501(c)(1) for limitations purposes are essentially the same as the elements of fraud under section 6653(b) for purposes of the fraud addition. Tomlinson v. Lefkowitz, 334 F.2d 262, 265 (5th Cir. 1964), *262 cert. denied 379 U.S. 962, 13 L. Ed. 2d 556, 85 S. Ct. 650 (1965); Estate of Temple v. Commissioner, 67 T.C. 143, 159-160 (1976); McGee v. Commissioner, 61 T.C. 249, 252, 261 (1973), affd. 519 F.2d 1121 (5th Cir. 1975); Amos v. Commissioner, 43 T.C. 50, 55 (1964), affd. 360 F.2d 358 (4th Cir. 1965). Hence, the bar of the statute of limitations does not apply in this case and the tax may be assessed "at any time" under the fraud exception. To reflect the above holdings, Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on $ 3,157↩
1. The fraud addition was not determined against petitioner Michael B. Brown.↩
2. The Court did not believe petitioner Judith M. Brown's vague testimony suggesting that she kept some cash in a zippered bank bag in a drawer at home. If this was the proverbial "cash hoard" story, it was singularly unpersuasive.↩
3. While petitioners' relatives testified about gifts of furniture, antiques, and other house furnishings (none of which are included as assets in the net worth computations and hence are not involved in this case), there is no suggestion that those relatives were financially able to, or in fact did, supply petitioners with all of these ordinary living expenses over a five-year period. There is a suggestion that Virginia Boykin permitted petitioners to get some free groceries from her grocery store, but there is no indication that all of their food was obtained that way. In fact any suggestion that petitioners incurred no expenses for food, clothing, and other necessaries over a five-year period would be ludicrous.↩
*. Eight of these checks were written by and to Judy but were actually signed by Osborne.↩
4. Petitioners produced affidavits of various family members in the course of the criminal tax investigation. The record does not clearly establish who actually prepared the affidavits of the various family members, but apparently it was either petitioner or her present counsel who had represented her throughout the criminal investigation and the audit. There was similarity in language, particularly phrases such as "currency in increments of as much as at a time and as much as per year." Also the period in these affidavits extended through 1983, so that the individual could have made such gifts in 1983, a year not before the Court, and still be technically correct but wholly misleading for purposes of this case. But the most telling fact in the record is the conflict between the sworn testimony of Mrs. Virginia Boykin, Michael's mother, in this Court and her earlier affidavit. Her testimony in the Tax Court starkly reveals the inaccuracies and misleading nature of her earlier affidavit. Regardless of who actually prepared the Boykin affidavit, it is clear that petitioner herself furnished the misinformation that found its way into that affidavit.↩
5. Because of the many stipulated figures and stipulated adjustments and the Court's findings of fact as to the amounts of any gifts of cash each year, the exact amount of unreported income can be determined by the parties in their Rule 155 computations.↩